[No. 11559. *En Banc.* December 6, 1913.]

FRED W. KELLY, *Respondent*, v. A. L. HAMILTON *et al.*,
*Appellants.*[1]

COUNTIES—POWER OF COMMISSIONERS—ERECTION OF COURTHOUSE—BONDS—ISSUE—SUBMISSION. Under Rem. & Bal. Code, § 3890, authorizing the board of county commissioners to erect courthouses, to allow all accounts against the county, and audit accounts of county officers, and to have the care and management of the county property and business, there is nothing which requires the board, in submitting a proposed bond issue for the construction of a courthouse, to submit, at the same time, plans and specifications for such a building, and in the absence thereof or of any resolution of the board definitely defining the structure they intend to build, they have power to determine them after the bonds are voted.

SAME—COUNTY COURTHOUSE BONDS—SUBMISSION—ELECTION—VALIDITY—FRAUD. Where the county commissioners were guilty of no fraud or conspiracy but acted in good faith, an election to authorize a bond issue to construct a county courthouse, the plans and specifications for which had not been determined by the county commissioners by resolution, is not invalidated by the fact that the board employed an architect, who made plans which were published and widely discussed by advocates of the plan, which misled the voters into authorizing the bonds, when in fact such a building could not be constructed for the sum provided.

SAME—VALIDITY OF ELECTION—FRAUD—REASONS OF VOTERS. An election to authorize a bond issue to construct a county courthouse cannot be invalidated by showing that many voters were induced to vote for the bonds by advocates of the plan upon the idea that the city and county were going to join in the erection of a building, where the proposition legally submitted was to issue bonds for the building of a courthouse for strictly county purposes; since the reasons of the voters cannot be inquired into.

Appeal from a judgment of the superior court for King county, Everett Smith, J., entered June 6, 1913, upon findings in favor of the plaintiff, in an action to enjoin the issuance of county bonds, after a trial to the court. Reversed.

[1]Reported in 136 Pac. 1148.

*John F. Murphy* and *Robert H: Evans*, for appellants.

*Carkeek, McDonald & Kapp, Irving M. Clark, Jackson Silbaugh, France & Helsell,* and *Robert C. Saunders,* for respondent.

*J. A. Stratton* and *Peters & Powell, amici curiae.*

MOUNT, J.—This action was brought by a taxpayer of King county to restrain the board of county commissioners from proceeding to the sale and delivery of $950,000 worth of King county courthouse bonds, and to restrain the commissioners from erecting a proposed county building in said county with the proceeds of the bonds.

The complaint alleges, in substance, that the county commissioners of King county, prior to the general election in November, 1912, entered into a conspiracy for unlawfully expending county funds; that they fraudulently misrepresented to the voters that an adequate public building for county purposes could be erected on a site then owned by the county for the maximum cost of $950,000; that, in furtherance of the conspiracy, they contracted with an architect to prepare plans and specifications for such building; that the plans submitted by the architect provided for a present building of seven stories covering the entire block of ground, on a foundation capable of supporting a structure of twenty stories high; that it was then known to the commissioners that such a building could not be constructed for any sum less than $1,600,000; that they submitted to the voters of King county, under an official resolution, the proposition of issuing county bonds not in excess of $950,000 for the construction of the building, and also an alternative proposition of issuing bonds not in excess of $1,400,000 for the purchase of a site and the erection of a county building thereon in the north end of the city of Seattle; that the commissioners had no information as to the cost of the county building and the site therefor, but that the sums named in both proposi-

tions were arbitrarily and fraudulently fixed so as to favor
the site already owned by the county, and with the further
intent of building a structure on said site which would cost
far in excess of $950,000; that the commissioners, prior to
the election, represented to the voters by letters, circulars,
photographs, and otherwise, that an adequate seven story
building could and would be built over the whole of the pres-
ent property for the maximum cost of $950,000; that three-
fifths of the electors voted on the proposition so submitted in
favor of a bond issue of $950,000 for the proposed building,
at a maximum cost of $950,000; that, after the election, the
commissioners ratified the plans as previously outlined by
the architect, which were the plans and drawings on exhibi-
tion prior to the election, and directed the detailed comple-
tion thereof; that they are about to issue bonds in the sum
of $950,000 for starting the construction of the proposed
building, well knowing that $950,000 will not complete the
same according to the plans prepared by the architect, but
intending to construct a building which will cost far in excess
of that sum. The prayer of the complaint is for an injunc-
tion prohibiting the issuance of the bonds so voted, and for-
bidding, in any event, the letting of a contract for a build-
ing to cost completed in excess of $950,000, and restraining
the expending of a sum in excess thereof in the erection of
such a building.

After a demurrer to the complaint had been interposed by
the defendants, which was waived before hearing thereon, the
defendants filed an answer denying any false and fraudulent
representations on the part of any of them. The answer ad-
mits the submission to a vote of two bond propositions, but
denies that either proposition specified any plans for the
building under contemplation. The answer further alleges
that the commissioners were about to proceed with the con-
struction of a county building to cost not in excess of
$950,000 from the proceeds of the authorized bond issue.

At the trial of the case, it appeared, without any dispute,

that, prior to September 30, 1912, the city council of the city of Seattle and the county commissioners of the county of King, in which county Seattle is situated, considered the feasibility of constructing a building for the joint use of the city of Seattle and the officers of the county of King. After a joint meeting of the city council of the city of Seattle and the board of county commissioners of King county, a resolution was passed in effect, that such a building should be constructed. An architect was thereafter employed to prepare tentative floor plans for such a building and submit the same to the county commissioners of King county. On September 30th, the county commissioners of King county passed a resolution as follows:

"This matter coming on for hearing before the board on the 30th day of September, 1912, at the regular meeting hour of said board, and the board, after due consideration given to said subject, find it to be for the best interests of King county and the people thereof, that said board should submit to the qualified electors of King county, at the general election to be held in King county, on the 5th day of November, 1912, the question of issuing certain county bonds for strictly county purposes, to procure money for the construction of a court house upon the property now owned by King county at the corner of Third avenue and James street in the city of Seattle, legally described as block 33, C. D. Boren's addition to the city of Seattle, King county, Washington. Said proposition shall be stated as follows:

"Shall the board of county commissioners of King county, Washington, be authorized to issue the negotiable, coupon, county bonds of King county in and to the aggregate amount of not to exceed $950,000 or so much thereof as may be necessary, . . . and by and through the board of county commissioners of King county, contract indebtedness by selling said bonds or portions thereof from time to time at not less than par; and expend or cause to be expended under the direction and subject to the approval of said board, all the proceeds of said sale to construct and in aid of the construction of said courthouse upon said site."

Upon the same date, the board passed another resolution submitting to the electors of the county the proposition of is-

suing $1,400,000 worth of county bonds for the purpose of acquiring a site and constructing a building in the north end of the city upon a site to be purchased by the county. This resolution was substantially the same as the one above quoted, except as to the amount of bonds to be issued.

Pursuant to these resolutions, notices were published calling an election on November 5th for the purpose of voting upon these two proposed bond issues by the qualified electors of the county. After the passage of these resolutions and while the notices were being published, a political campaign was conducted throughout the county by the friends of each measure for the purpose of securing the requisite number of votes to carry the propositions submitted in the resolutions. While this campaign was being conducted, a perspective of a building was drawn by the architect. This perspective showed a building covering an entire block of ground and some twenty stories high. Pictures were made of this drawing and were scattered broadcast over the county. It was not claimed by the advocates of the proposed bond issue that this completed building could be constructed for the amount thereof, but it was urged that six or seven stories of the building might be completed for the $950,000. When the election came on, the bond issue for $1,400,000 was defeated, but the bond issue for $950,000 for the construction of a building upon the block then owned by the county carried by a large majority. After the election, the bonds were advertised for sale and purchasers were secured therefor. The county commissioners thereupon concluded that a building the size of the block could not be constructed to the height of seven stories for the amount of the bond issue, and were proceeding to call for bids for a building of smaller dimensions, when this action was brought to restrain both the sale of the bonds and the construction of the building which they proposed to erect.

The trial court, after hearing all the evidence in the case, found in substance, that the county commissioners were not

guilty of fraud in submitting the bond issue to a vote of the people, but concluded that, inasmuch as the architect employed by them had prepared plans and a prospectus which showed a very large building and had scattered the same, or had been instrumental in scattering the same, throughout the county prior to the election, and because of this advertisement, votes were probably cast in favor of the bonds which might not have been cast in favor thereof, concluded that the bond issue was illegal and unwarranted, and therefore issued an injunction restraining the sale of the bonds. The commissioners, and the auditor and the treasurer of King county have appealed from that judgment.

It was apparently conceded throughout the trial of the case, and is not disputed here, that the question of issuing $950,000 in bonds of King county for strictly county purposes and procuring money for the erection of a courthouse upon the property owned by King county described as block 33, C. D. Boren's addition to the city of Seattle, was regularly submitted to the electors of King county, and that the question carried by the required majority. But it is contended that the legality of this bond issue is destroyed by the fact that, prior to the election, electors were informed by advocates of the measure that a certain building would be constructed for the amount of the bond issue. It will be noticed that, in the resolution submitting the question of issuing county bonds for strictly county purposes to procure money for the construction of a courthouse, the character or details of the courthouse so to be constructed was not stated. The commissioners simply submitted the proposition to the voters of the county whether or not the bond issue should be made for the purpose of constructing a courthouse. The definite character of the building was not specified, except that it was to be for a courthouse to cost not to exceed $950,000.

The statute, Rem. & Bal. Code, § 3890 (P. C. 115 § 193), provides:

"The several boards of county commissioners are author-
ized and required,—

"1.   To provide for the erection and repairing of court-
houses, jails, and other necessary public buildings for the
use of the county ; . . .

"5.   To allow all accounts legally chargeable against such
county not otherwise provided for, and to audit the accounts
of all officers having the care, management, collection, or dis-
bursement of any money belonging to the county or appro-
priated to its benefit.

"6.   To have the care of the county property and the
management of the county funds and business, . . . ."

We find nothing in the statute, and no provision is called
to our attention, which requires the board of county commis-
sioners in submitting a proposed bond issue for the construc-
tion of a county courthouse, to submit, at the same time,
plans and specifications for such building; and in the absence
of such a provision, and especially in the absence of a resolu-
tion by the board definitely defining the structure which they
intend to build, it is clearly within the power of the county
commissioners, after the bonds are voted, to determine the
plans and specifications for the building which they shall
construct.   Where authority is vested by law in the board of
county commissioners to provide for the erection of court-
houses, it is at least doubtful if the board of county commis-
sioners could legally shift the responsibility of determining
the specific character of building which they intended to con-
struct to any other person, board or commission.   In speak-
ing to this question, in *Yesler v. Seattle*, 1 Wash. 308, 25
Pac. 1014, in reference to the power of a city council, this
court said:

"Now, the power is thus delegated to the municipal legisla-
ture, with the assent given, to proceed and 'borrow money'
or 'contract indebtedness,' it being the sole judge of the
proper method, whether by bonds, or warrants, or open ac-
count, confidence being reposed in the wisdom and honor of
its members that they will act for the best interest of the com-
munity.   No citizen or taxpayer can question, in the courts,

the uncorrupted action of his city council in these particulars. . . . Nor does the law permit the council of a city to delegate to the popular vote the determination of any matter before it, unless the right to so delegate it has been expressly conferred or enjoined by statute. . . . Therefore we conclude that the council could lawfully submit to vote only those matters directed to be submitted by its superior authority, the legislature."

And in this case, the board of county commissioners did not submit to the voters of the county the question as to the specific building to be constructed. They, therefore, reserved that right to themselves to act according to their best judgment.

It is true the county commissioners employed an architect who prepared a perspective for a building, a picture of which was scattered broadcast throughout the county, and the fact that the picture was being used was probably known to the commissioners. It is argued by the respondent that the county commissioners were bound by the acts of this architect, and that, therefore, they were required to build the building pictured for the sum specified in the bond issue. But the board of county commissioners can act authoritatively only by resolution properly spread upon the minutes and joined in by a majority of the board. This it is conceded was never done. The commissioners were no more bound by the unauthorized acts of the architect than they were by speeches or statements of enthusiasts who were advocating or resisting the issuance of the bonds. Whether or not the building which the enthusiasts supposed could be built for $950,000 could be built for that sum, or whether its cost would be two or three times that sum, were political questions which were to be decided by the voters individually, and the courts cannot review such questions. When it was determined from the evidence—and we think the evidence cannot well be construed otherwise—that the board of county commissioners were guilty of no fraud or conspiracy, but acted in good faith, this was the end of the matter so far as the commis-

sioners were concerned. In short, the legality of the bond issue depended entirely upon the question which was submitted by the record to the voters, and upon which a majority of, the vote was cast. To go further than the question which was presented legally upon the ballot, and inquire into the causes of the vote, would be to open the door to all sorts of speculation, which cannot be indulged in. In *Montgomery v. Orr*, 27 Fed. 675, the court said:

"Except when attacked for fraud, their decision [the county commissioners] as to the character of a court-house that is needed is final."

And in *Rotenberry v. Board of Supervisors*, 67 Miss. 470, 7 South. 211, the court said:

"The power of the board of supervisors over court-houses, and sites for court-houses, is complete and exclusive in this state, and no interference with the exercise of this power, by the chancery courts, can be upheld, so long as the power is alleged to be only exercised unwisely and without discretion."

The respondent relies upon the case of *Tukey v. City of Omaha*, 54 Neb. 370, 74 N. W. 613, 69 Am. St. 711. In that case the proposition was submitted to the people whether bonds in the sum of $200,000 should be issued for the purpose of paying the cost of securing a site for a market place and erecting a market house thereon. The public officials were about to erect a market house upon property already owned by the city without securing a market site. The court said:

"That when the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly complied with, and the term of the authority granted be strictly and fully pursued, is so well settled that it would be idle to cite authorities on the proposition."

The bonds in that case were enjoined because the proceeds were about to be used for the construction of a market house on property belonging to the municipality, whereas the bonds had been voted for the purpose of purchasing a site

and constructing a market house thereon. The proceeds of the bonds in that case were not being used for the purposes for which they were authorized and the court, of course, enjoined the issuance of the bonds. But in this case, the bonds are to be used precisely for what they were authorized, namely, the construction of a courthouse.

The respondent also relies upon the case of *Wullenwaber v. Dunigan*, 33 Neb. 477, 50 N. W. 428. That was a case where a railroad company had promised, in consideration of a vote of bonds to aid in the construction of its road, to locate a depot at a certain point. The court held that the promise of the railroad company constituted a part of the consideration for the bonds, and the failure to furnish the depot relieved the city from issuing the bonds. And this was clearly correct. But in this case the county commissioners authorized a vote merely upon the question whether the bonds should be issued for strictly county purposes for the construction of a courthouse.

Argument is also made to the effect that it was the idea of the voters, when the proposition was submitted, that the city and county should join in the construction of the building which was to be erected. After the election, the county commissioners were advised by the county attorney that the county was not authorized by law to construct a building jointly with the city of Seattle, nor for the use of the city; that the construction of the building must be for strictly county purposes. It is contended, and evidence was introduced to the effect, that a large number of the voters voted in favor of the bonds because it was the intention of the city and county to build the building jointly. As we have heretofore said, the reasons influencing voters to vote for or against the bonds cannot now be considered. Those reasons are political. The question submitted upon the record was whether or not the county commissioners should be authorized to issue bonds in the sum of $950,000 for strictly county purposes, namely, for the building of a courthouse. The specifications

for such courthouse were not stated by any official action of the board prior to the election, and the reasons of the voters in voting for or against the issue cannot now be inquired into by the courts. The question of bonds was legally submitted in the form required by law; it was carried by the requisite vote; and if the county commissioners see fit to construct a courthouse and to use the proceeds of the bonds for that purpose, their action is final, and except for fraud, cannot be inquired into. No fraud is shown.

The judgment of the lower court is therefore reversed, and the action dismissed.

Crow, C. J., Gose, Morris, Main, Ellis, and Parker, JJ., concur.