[No. 27949.   Department Two.   March 4, 1941.]

WEYERHAEUSER TIMBER COMPANY *et al., Appellants,*
v. SCHOOL DISTRICT NO. 118 OF PACIFIC COUNTY
*et al., Respondents.*[1]

[1]Reported in 110 P. (2d) 872.

684

*W. E. Heidinger* and *T. J. Hanify,* for appellants.

*John T. Welsh* and *John B. Shorett,* for respondents.

DRIVER, J.—Prior to August 4, 1938, the Federal public works administration authorized a grant of funds to school district No. 118 of Pacific county for a grade school building project. On that date, at a mass meeting called by the directors of the district, a recommendation was made that this project be abandoned and that an application be made for a new Federal grant to aid in the construction of an addition to the high school building. This recommendation was adopted by the board of directors at a meeting held the following day.. The next meeting was on August 11th, and the minutes recite the action taken by the board as follows:

"A Special Meeting of the Board of Directors was called on August 11, 1938 for the purpose of conferring

with the representatives of Mock & Morrison, Architects, of Tacoma, Washington who presented their tentative plans for the proposed addition to the High School Building, together with their estimated cost of $54,000.00.

"On motion of W. T. Countryman, and seconded by Dan F. Coulter, a Resolution was adopted making application to the P. W. A. through C. C. Hockley, Regional Director in Portland, Oregon for a grant of $24,000.00 for the purpose of building an addition to the present High School Building.

"It was further agreed to hold a special election on September 13, 1938 for the purpose of securing a levy of 25 mills in order to match the Grant of $24,000.00 *in the event the Government of the United States of America should see fit to extend the offer of said Grant* as requested. Notice of said election to be duly posted for such time and in such places as required by law and the Clerk of the Board of Directors is hereby notified to make such postings." (Italics ours.)

The board met again on September 2nd, and the pertinent part of the minutes for that meeting reads:

"In the matter of the Special Election to be held on September 13, 1938 at which time the following proposition will be presented to the electors of School District No. 118 of Pacific County, Washington

" 'Shall the Board of Directors of South Bend Public Schools, District No. 118, be authorized to levy 25 mills for the purpose of building an addition to the present high school building.' "

This "proposition," in substantially the same language, was embodied in the notice of election as published and in the official ballot. Neither the election notice nor the ballot mentioned any contemplated grant of public works administration funds. However, in the issue of the weekly newspaper which carried the first publication of the notice of election, a news article stated that the school district had applied for an "outright grant" of Federal funds, and that

"The special levy will not be made, school officials say, unless this grant is approved, . . ." The next week, the same newspaper published a similar statement in a front-page editorial. These statements were not authorized by the school board or by any member thereof.

At the election, which was held on September 13th, the proposal for a special twenty-five mill tax levy carried by the requisite majority. However, the Federal grant was never authorized, and, in February, 1939, the district was notified by the public works administration officer in Portland that, available funds having been exhausted, authorization was impossible without further congressional action.

On March 13, 1939, Weyerhaeuser Timber Company and Willapa Harbor Lumber Mills, corporations, paid the special tax under written protests, in which the claimed ground of illegality was stated as follows:

"During the year 1938 said school district applied to the Public Works Administration of the United States for a grant of $24,000.00 for the purpose of building an addition to the present high school building of said district, and the aforesaid special tax was authorized and levied for the sole purpose of raising funds with which to match the grant so applied for, in case the same were obtained. The application for said grant was rejected, and the grant was not obtained, and the purpose for which said special tax was levied has failed, and the tax thereupon became and is illegal."

In April, 1939, the two corporations, as plaintiffs, brought this action for refund of the special tax in their own behalf and in behalf of all other taxpayers within the district similarly situated. There was no allegation in the complaint, nor was there any evidence adduced at the trial, that any taxpayer, other than the plaintiffs, had paid the tax under protest. After a trial

to the court, a decree was entered dismissing the plaintiffs' action. This appeal followed.

■ We shall first consider this question: Is the statute, Laws of 1931, chapter 62, p. 201, as amended by Laws of 1937, chapter 11, p. 19 (Rem. Rev. Stat., § 11315-1 [P. C. § 6882-189] *et seq.*), which requires payment of taxes under protest as a condition precedent to an action for recovery thereof, applicable to the instant case?

The pertinent part of § 2 as amended (Rem. Rev. Stat. (Sup.), § 11315-2 [P. C. § 6882-190]) reads as follows:

"In all cases of the levy of taxes for public revenue which are deemed unlawful or excessive by the person, firm or corporation whose property is taxed, or from whom such tax is demanded or enforced, such person, firm or corporation may pay such tax or any part thereof deemed unlawful, under written protest setting forth all of the grounds upon which such tax is claimed to be unlawful or excessive; and thereupon the person, firm or corporation so paying, or his or its legal representatives or assigns, may bring an action in the superior court or in any federal court of competent jurisdiction against the state, county or municipality by whose officers the same was collected, to recover such tax, or any portion thereof, so paid under protest: . . ."

Appellants contend that the statute does not apply because the protest requirement set forth in § 2 just quoted, relates only to taxes levied for *public revenue,* whereas, in the case at bar, the tax was not levied for public revenue, but for "a specific construction purpose."

Appellants overlook the fact that § 2 is permissive only and constitutes an exception to the general bar erected by § 7 of the act against an action attacking the validity of *any tax.* Section 7, p. 204, as amended

by Laws of 1939, chapter 206, p. 772, § 49 (Rem. Rev. Stat. (Sup.), § 11315-7 [P. C. § 6882-195]), provides:

"Except as permitted by this act, no action shall ever be brought or defense interposed attacking the validity *of any tax, or any portion of any tax:* . . ." (Italics ours.)

(The 1939 amendatory statute, effective March 19, 1939, made no change in § 7 which is here material.)

Considered together, §§ 7 and 2 manifestly mean that the former bars an action questioning the validity of *any tax,* but the latter constitutes a permissive exception and provides that, as to the taxes levied for "public revenue," a person *"may"* pay a tax under protest and thereupon *"may* bring an action . . . to recover" the same. The test to apply is not whether the tax here involved is one levied for public revenue under § 2, but, rather, whether it is "any tax" within the meaning of § 7. Manifestly, it is an *ad valorem* property tax, and, as such, is subject to the requirements of the "protest" statute, which provides an exclusive method of challenging the validity of any tax, or any portion of any tax. *In re Yakima Amusement Co.,* 192 Wash. 174, 73 P. (2d) 519.

In any event, it would seem that the special tax here involved was one levied for public revenue. It was special only in the sense that, being in excess of the school district's ten-mill limit under initiative measure No. 114, then in force, Laws of 1937, chapter 1, p. 3, § 1, it required authorization by a vote of the electors. Otherwise, it was the same as other taxes of the district. The fact that its proceeds were earmarked for a particular purpose would not deprive them of their public character if such purpose was a public one. The construction of a schoolhouse affects all the people of the taxing district and is just as truly a public use of funds as the payment of a teacher's salary.

The protest statute, therefore, applies to the case at bar; and, since the record does not show that any person, other than the appellants, has. paid the tax under written protest, the relief which appellants seek in behalf of other taxpayers must be denied.

Furthermore, the same protest statute limits the grounds on which appellants may challenge the special tax levy. Section 2 (Rem. Rev. Stat. (Sup.), § 11315-2), as we have pointed out, permits a person to bring an action to recover taxes which he has paid if he first complies with its requirements as to protest. These requirements are that the tax shall be paid "under written protest setting forth *all the grounds* upon which such tax is claimed to be unlawful or excessive; . . . " (Italics ours.)

The effect of this statutory provision is to strictly limit a taxpayer to the grounds of illegality of the tax stated in the written protest upon which his action is based. *Thomson v. Maxwell,* 23 Fed. Cas. 1100; *Peninsula Iron Co. v. Crystal Falls,* 60 Mich. 79, 26 N. W. 840; *Aurora Iron Mining Co. v. Ironwood,* 119 Mich. 325, 78 N. W. 126; *Davis v. Otoe County,* 55 Neb. 677, 76 N. W. 465; *Millhaubt v. McKee,* 141 Kan. 181, 40 P. (2d) 363; *Kansas Gas & Electric Co. v. Dalton,* 142 Kan. 59, 46 P. (2d) 27; *Henderson v. Board of Commissioners,* 147 Kan. 64, 75 P. (2d) 816.

As we have already pointed out, the protests of the appellants stated but one ground of illegality, namely, that the sole purpose of the special levy was to match a grant of public works administration funds, and, the grant having been denied, this purpose had failed. Whether the school district election was regularly conducted in accordance with the governing statutes, whether the purpose of the special tax levy was stated properly and with the requisite particularity on the official ballot, and whether, prior to the election, the

school board had adopted a sufficiently definite building plan, are questions which were not mentioned in the written protests, and, consequently, are not now before us for determination.

The purpose of the special levy was clearly and concisely stated in the notice of election and on the official ballot to be that of "building an addition to the present high school building." The purpose thus stated was proper, definite, and unambiguous; and appellants, in support of their contention that the special levy was conditional on the securing of the grant of Federal funds, must of necessity, rely upon the minutes of the August 11th meeting of the board of directors and upon the representations made in the newspaper articles to which we have referred.

It seems too clear to require much comment that the legality of a school election should not be made to depend upon statements published in a newspaper for which the directors were in no way responsible. Proposals for special tax levies commonly provoke widespread public discussion in which intemperate statements are not unusual. If representations made in the course of such discussions were to be considered in determining the validity of the levies, then rarely would a proposal be able to survive the misguided zeal of its friends, even though it had withstood the attacks of its enemies, and prevailed at the polls.

We have, then, this final and crucial question for determination: Should the minutes of the August 11th meeting of the school directors be regarded as qualifying the proposal actually submitted to the electors on the official ballot?

This court has never been called upon to directly decide such a question. However, the case of *Kelly v. Hamilton,* 76 Wash. 576, 136 Pac. 1148, is quite simi-

lar, in factual situation, to the instant case. In that case, a taxpayer sought to enjoin the commissioners of King county from selling bonds and using the proceeds to build a courthouse. Sometime prior to September 30, 1912, the commissioners and the council of the city of Seattle had met together and had adopted a resolution to the effect that a building should be constructed for the joint use of the county and the city. On September 30th, the county commissioners passed another resolution directing that the question of issuing bonds for the construction of a courthouse on a site owned by the county be submitted to the voters. Tentative plans of the projected building, prepared by an architect at the instance of the commissioners, were given wide publicity in the campaign preceding the bond election. These plans and the representations made with reference thereto by advocates of the bond issue indicated that the proposed courthouse would be substantially larger and more elaborate than could possibly be constructed by the bond issue in the amount which the electors of the county were called upon to authorize. The bonds were authorized at the election, but, thereafter, the prosecuting attorney advised the commissioners that the county could not lawfully join with the city in the construction of a building. This court held that the bond issue was valid. The following quotations from the opinion state the reasoning upon which the decision was based:

"The commissioners were no more bound by the unauthorized acts of the architect than they were by speeches or statements of enthusiasts who were advocating or resisting the issuance of the bonds. Whether or not the building which the enthusiasts supposed could be built for $950,000 could be built for that sum, or whether its cost would be two or three times that sum, were political questions which were to be decided by the voters individually, and the courts cannot

review such questions. When it was determined from the evidence—and we think the evidence cannot well be construed otherwise—that the board of county commissioners were guilty of no fraud or conspiracy, but acted in good faith, this was the end of the matter so far as the commissioners were concerned. In short, the legality of the bond issue depended entirely upon the question which was submitted by the record to the voters, and upon which a majority of the vote was cast. *To go further than the question which was presented legally upon the ballot, and inquire into the causes of the vote, would be to open the door to all sorts of speculation, which cannot be indulged in.* . . ." (Italics ours.)

"It is contended, and evidence was introduced to the effect, that a large number of the voters voted in favor of the bonds because it was the intention of the city and county to build the building jointly. As we have heretofore said, the reasons influencing voters to vote for or against the bonds cannot now be considered. Those reasons are political. The question submitted upon the record was whether or not the county commissioners should be authorized to issue bonds in the sum of $950,000 for strictly county purposes, namely, for the building of a courthouse. The specifications for such courthouse were not stated by any official action of the board prior to the election, and the reasons of the voters in voting for or against the issue cannot now be inquired into by the courts. The question of bonds was legally submitted in the form required by law; it was carried by the requisite vote; and if the county commissioners see fit to construct a courthouse and to use the proceeds of the bonds for that purpose, their action is final, and except for fraud, cannot be inquired into."

Appellants earnestly maintain that the statement in the first of the two excerpts just quoted, that the legality of the bond issue depended upon the "question which was submited *by the record* to the voters," indicates that this court will go behind the statement on the ballot and consider the records, or minutes, of the

governing board to determine the true tenor and purport of a proposal submitted to the voters. The phrase should not, however, be construed apart from its context. The very next sentence after the one in which it appears, states, in effect, that this court will inquire no further than the "question which was presented *legally upon the ballot.*"

These two expressions "by the record" and "legally upon the ballot," when considered in connection with their context, are not inconsistent. They mean that the question stated on the ballot is controlling if, according to the record, it is *legally* on the ballot, that is to say, in conformance with the requirements of the applicable law. To be legally on the ballot, the question must be there upon the authorization and at the direction of the governing board of the municipality empowered to act in that regard.

So, in the *Kelly* case, this court seems to have considered the resolution of the county commissioners of September 30th, which merely directed that the proposal in question be submitted to the electors, but the significant thing is that the court did not consider the prior resolution adopted by the commissioners in their joint meeting with the city council, to the effect that a building should be constructed jointly with the city.

In the case at bar, the submission to the school district electors of the special tax proposal was authorized at the September 2nd meeting of the directors. Pursuant to such authorization, the question of levying a special tax to construct an addition "to the present high school building" was submitted "legally upon the ballot" and "by the record." There being no fraud or misconduct on the part of the directors, the legality of the special tax is not affected by the minutes of their prior meeting of August 11th, which indicate

that the action of the board was influenced by the expectation of receiving a grant of funds from a Federal agency.

However, even though we should consider the minutes of the meeting of August 11th in connection with the ballot proposal they can hardly be said to make the levy of the tax conditional upon the securing of Federal funds. Manifestly, the directors knew that their request for such funds might not be granted because the minutes recited that the special tax was to be used to match public works administration funds "in the event the Government of the United States of America should see fit to extend the offer of said Grant." On the other hand, the direction that the special tax levy election should be held on September 13th was positive and unqualified. Nowhere did the minutes state directly, or indicate by implication, that the special levy would not be made or would be abandoned in the event the grant of funds should be denied by the Federal agency.

The decree of the superior court dismissing the action is affirmed.

STEINERT, BLAKE, JEFFERS, and BEALS, JJ., concur.