## No. 14,390.

BEDFORD, STATE TREASURER ET AL. *v.* GAMBLE-SKOGMO, INC.
(91 P. [2d] 475)

Decided May 29, 1939.

Mr. BYRON G. ROGERS, Attorney General, Mr. ELMER P. COGBURN, Assistant, for plaintiffs in error.

Mr. JAMES W. CREAMER, pro se.

Messrs. FRANKBERG & BERGHUIS, Messrs. HUGHES & DORSEY, Mr. E. G. KNOWLES, for defendant in error.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THE sole question for determination in this case is whether or not the defendant in error, Gamble-Skogmo, Inc., to which we shall refer as the company, is liable, under the provisions of chapter 216, Session Laws of 1935—an initiated measure adopted by vote of the people in the 1934 general election and commonly referred to as the "Colorado Chain Store License Law"—for the payment of license fees for the operation of what are called "Gamble Agency Stores", operated in Colorado for the years 1935, 1936 and 1937. This issue was raised in the district court by the company's complaint in an action seeking a declaratory judgment, to which the plaintiffs in error, for whom we will hereinafter substitute the

term state, filed an answer and cross complaint seeking judgment for license fees alleged to have accrued during the said years. The trial court resolved the question in favor of the company and the state seeks a review of the judgment.

The company, a Delaware corporation with its principal office at Minneapolis, Minnesota, during the period here involved, was engaged in the business of selling merchandise such as automobile accessories, electrical appliances, tools, etc., and in this connection operated 230 retail stores in twenty northwestern states; five of these admittedly owned stores were operated in Colorado, were duly licensed under the Colorado law, and no controversy exists with reference to them. In addition to the operation of these five admittedly owned and controlled stores, designated as "Gamble Stores", the company sells merchandise to certain locally owned stores in Colorado under a uniform contract arrangement, inaugurated in 1933, by which these stores are given the right to use the name "Gamble Store Agency". There were nineteen such agency stores in Colorado during the year 1935; thirty-one during the year 1936, and thirty during the year 1937. The company asserts that these agency stores were wholly individually owned, controlled and operated by the local agency operators as a result of which, as to the company, there is no liability for the graduated license fees on multiple stores imposed by the act. It is the state's contention that the operation of the agency stores was "ultimately controlled" and "directed" by the company within the meaning of section 7 of the chain store law, supra, and that these agency stores really constituted a chain of stores under the statute. Section 5 of the act is as follows: "Every person, firm, corporation, association or co-partnership opening, establishing, operating or maintaing one or more stores or mercantile establishments within this state, under the same general management, supervision or ownership, shall pay the license fees hereinafter described for the privilege of

opening, establishing, operating or maintaining such stores or mercantile establishments."

Section 7, upon which the state principally relies, is as follows: "The provisions of this Act shall be construed to apply to every person, firm, corporation, association or co-partnership, either domestic or foreign, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management."

In 1931, in *State Board of Tax Commissioners v. Jackson*, 283 U. S. 527, 51 Sup. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, the Supreme Court of the United States, in declaring constitutional an Indiana chain store tax act (Act 207 of 1929), determined that the chain store has many features and advantages which definitely distinguish it from the individual store dealing in the same commodities, and it held that these distinctions afforded a valid basis of classification for the imposition of the tax upon the operation of mercantile establishments graduated according to the number of stores operated. In 1933 this pronouncement was reiterated by that tribunal in *Liggett v. Lee*, 288 U. S. 517, 53 Sup. Ct. 481, 77 L. Ed. 929, since which time there has been consistent adherence to the principle by the courts throughout the land.

The constitutionality of such legislation having so been unimpeachably established, the people of Colorado in adopting the initiated measure here under consideration, proclaimed the public policy in this state on store taxation in 1934, and in 1938 reaffirmed this declaration by voting against its repeal. While the validity of the act is not challenged in this proceeding, the distinctions which constitutionally validated the classification between multiple and single-store operations, must be considered of major importance in the construction and application of the act and we proceed on that premise.

By the uniform contract, under which the agency stores operate, the company agrees to sell to the agency operator at prices to be established from time to time by

the company, such merchandise as the company regularly carries for sale in its own stores; to make adjustments for any merchandise so sold which in the opinion of the company was defective at the time of sale; to grant to the agency operator the right to paint his store with the distinguishing blue and orange colors used by the company on its "Gamble Stores" upon request of the operator, agrees to advise him relative to methods of merchandising, and, upon payment for the same by him, agrees to furnish circulars and other advertising of the same general character used by the company in its regular stores. By the contract the agency operator agrees that, unless otherwise authorized in writing, he will purchase merchandise from the company at one of its stores within the state—usually nearest the agency store—and pay for the goods cash on delivery, or if merchandise is shipped directly from the company's warehouse or other sources, the operator shall pay therefor in advance before shipment, and that he will constantly exhibit the merchandise bought from the company in the agency store windows and display cases. The operator also agrees to exercise his best efforts to maintain and increase sales of the company's merchandise, and in this connection is given the right to use the name "Gamble Store Agency" to advertise that the local store is selling merchandise purchased from the company. It is provided that in his business the operator shall not use the words "Gamble Stores", nor shall he use any words, sign or symbol on or in his store, nor shall he do any act during the term of this contract which in any way shall designate such store as being owned, controlled, supervised, operated or maintained by the company, nor shall the operator have any authority to make any binding agreement on behalf of the company as agent or otherwise. The contract may be terminated by either party on thirty days' written notice to the other. Upon the termination of the contract the operator is required to remove all signs and marks distinguishing such store as a "Gamble Agency Store", and

if painted with the blue and orange colors above mentioned, the operator shall repaint the store so as to remove such distinguishing colors and marks as are used by the company agency stores, otherwise in the event of his failure to do so the company is given the right to effect the obliteration.

The contract next proclaims: "3 (e): That the Retailer is an independent merchant who does and shall during the entire term of this contract, solely, own, control, manage, and supervise his own store." Following which, in conclusion, is this paragraph: "(f) In consideration of the agreement herein contained, the Retailer gives to the Wholesaler, upon the termination of this agreement by cancellation by either party or otherwise, an option to buy from the Retailer, within thirty days after such termination of the contract, all salable merchandise purchased from the Wholesaler at the Wholesaler's current wholesale selling prices of such products and/or also an option to purchase any or all of the fixtures in the Retailer's store at the current replacement cost thereof, less reasonable depreciation; and/or an option to take over the unexpired terms of any existing leases covering the store building in which the Retailer does business at the time of such termination. In case of exercising such last option, the Retailer agrees to sign over to the Wholesaler or to whomsoever it directs any such lease or leases."

The testimony, in which there is no serious conflict, discloses that the price paid by the agency store operators for merchandise is determined by the company's own retail price less certain discounts to the operator which average about twenty per cent. While in certain instances it is shown that upon the retail resale of the merchandise some operators charge prices in excess of those fixed by the company, generally there was a close adherence by agency operators to the retail prices established by the company, and the general tenor of the advertising, admittedly used by the agency stores, was designed to show that the regular Gamble store prices were

430

available to the public. The following is typical of this type of advertising: "This new authorized Gamble Store Agency will handle regular Gamble Store merchandise at regular Gamble Store prices. There are now 230 Gamble and Tiger Stores and 1,000 Gamble Store Agencies in the north and middle west handling automobile supplies, radio, paint and many other similar lines of merchandise. This new Gamble Store Agency has the buying power of over 1,230 retail stores. The great savings we can make, buying in such volume, are passed on to you."

From time to time the agency stores conducted special sales known as "Gamble Manager Sales". Printed advertising material was prepared by the company and distributed through its admittedly owned stores and the agency stores, and in the latter the sales were conducted and prices charged in substantial accordance with the advertising. In addition to these special sales, uniform contests were held from time to time by the agency stores, that were sponsored by the company, which likewise furnished the prizes or premiums awarded in such contests.

The evidence further discloses that without exception the agency stores were designed, colored and maintained in the same uniform style as were the admittedly owned Gamble stores and the merchandise display was identical or similar. Generally, except as to the name of the store, the advertising used by the Gamble stores and the agency stores was identical. It further appears that the company suggests methods of bookkeeping, accounting and sales operations. It also makes available to the operators a means of making credit sales and discounting negotiable credit paper. Every agency operator under the prevailing uniform practice, replaced guaranteed merchandise which proved defective, whether it was sold by his store or by a Gamble store or some other agency store. While in some instances goods other than Gamble merchandise were sold by the agency store, the overwhelming volume of agency stores business pertained to

the buying and selling of Gamble merchandise. A representative of the company testified that the company approves of an agency operator selling competing merchanrise when it pleases the customer and tends to increase the sale of Gamble brands. Most of the agency operators, pursuant to another suggestion of the company, make monthly reports to the company as to the amount of merchandise sold each month, the amount of stock on hand, credits made, cost of operations, etc. As an assistance to prospective operators the company also provides a uniform lease blank which contains a provision permitting the cancellation by the lessee in the event of the enactment of "anti-chain store legislation" in the jurisdiction involved. The evidence also disclosed that upon occasion representatives of the company called upon the agency stores in connection with the company's sponsored services hereinabove mentioned. To avoid the implications arising from the uniformity in the business practices and sales policies of the agency stores, well recognized characteristics of chain store operation, the company points out that under the contract the agency store operators were not compelled or obligated to avail themselves of the various services and advantages offered by the company, and says that the circumstance that the agency owners were generally willing to follow suggestions as to how to make a success of their business, does not indicate that they are legally controlled by the company.

Notwithstanding this contention we are compelled to believe that on the one side there is an intimacy of regulation and on the other a fullness of submission which imports ultimate control in the company. One of the effective weapons in this behalf is found in paragraph 3 (f) of the contract quoted. It therein is expressly provided that for thirty days after the termination of the contract, which it will be recalled may be accomplished by either party on thirty days' written notice to the other, the company shall have the option to buy all salable merchandise theretofore purchased from the company, at the

company's current wholesale selling price; to buy the fixtures of the agency stores at the current replacement cost, less depreciation, and to take over the unexpired lease covering the building in which the agency business is conducted. In other words, upon the termination of the contract which may arbitrarily be accomplished by the company by giving written notice, it is given a thirty day option to purchase the stock, fixtures and lease of the agency operator upon the basis specified. Obviously this provision is unilaterally favorable to the company and impels the conviction that it was inserted in the contract as a subtle, though none the less effective, method of masquerading its so-called optional provisions into compelling mandates. The fact that in Colorado the option so conferred actually never has been exercised, in no way detracts from its contractual effect on the relationship. Nor does the circumstance that several of the agency stores operate on a month to month rental basis without written leases militate against the general result occasioned by the provision in the contract relating to the assignment of the lease on the termination of the contract.

By the express terms of our statute, an operator is made liable for graduated license fees if multiple stores are ultimately controlled or directed by him. Under chain store tax statutes similar in principle to the Colorado act, the courts have determined that "control" in the strict legal sense is not a requisite to this liability for the tax. In *Gulf Refining Co. v. Fox*, 11 Fed. Supp. 425 (affirmed by the United States Supreme Court, 297 U. S. 381), the court said: "It may be conceded that it [the principal company] does not exercise full control over all the actions of the dealers in a strict legal sense, but its actual control is so effective that little room is left for independent action on their [filling station proprietors] part, while full enjoyment of the advantages inherent in a chain store system on its part is ensured. Adequate control over the operating methods of the dealers and

of the retail prices of the goods is secured by the right retained by the company to cancel the license agreement and to put an end to the business relations between the parties; * * *." To the same effect is *Maxwell v. Shell Petroleum Products*, 90 F. (2d) 39 (Certiorari denied by United States Supreme Court October 11, 1937). See, also, *Fox v. Ashland Ref. Co.*, 11 Fed. Supp, 431 (affirmed by the United States Supreme Court, 297 U. S. 381). Nor for the "control" to be effective need the strict relationship of principal and agent exist. *S. B. McMaster, Inc. v. Chevrolet Motor Co.*, 3 F. (2d) 469. In the light of these authorities we believe the trial court was in error in concluding that "control" as used in our statute implied an element of active and exercised compulsion.

The late Mr. Justice Cardozo in the opinion in *Fox v. Standard Oil Co.*, 294 U. S. 87, 55 Sup. Ct. 333, 79 L. Ed. 780, speaking of the chain organization there under consideration, said: "We have here abundant capital; standardization in equipment and display; superior management; more rapid turnover; uniformity in store management; special accounting methods; and a unified sales policy coordinating the diverse units." Also mentioning these characteristics the majority opinion in *State Board of Tax Commissioners v. Jackson, supra,* in a more detailed manner describes the points of difference between the operations of chain stores and independently owned units. As did the appellants in *Liggett v. Lee, supra,* the company in its brief here enumerates the attributes of chain organization alluded to in those cases and, without measuring the general result, categorically attempts to distinguish therefrom the operations under consideration by suggestions of difference and diversity of particulars in the business methods employed in each case. The error attendant upon this attempt is well expressed by Mr. Justice Roberts, author of the majority opinion in the Jackson case, when he said in the court opinion in Liggett v. Lee: "In their endeavor thus to distinguish the earlier

case, the appellants stress mere details, but ignore the underlying reason for sustaining the classification there attacked. The decision in the Jackson case was based not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store; and that the difference between an integrated and a voluntary chain is fundamental.''

An examination of the contract, even with its express proclamation that the agency store operator is ''an independent merchant,'' and its repeated disclaimers of the relationship of principal and agent between the company and the agency stores, in the light of the method of operation as disclosed by the evidence, makes irresistible the conclusion that the purpose of the contract was to initiate a system from which both parties could reap all the advantages of chain store operation with immunity from the burdens thereof, and further assuring to the company the special advantages of a chain without the necessity of its advancing or investing capital or assuming financial responsibility in the operation of the agency stores.

We, therefore, must conclude that within the meaning of the statute, the operations of the agency stores were ultimately controlled and directed by the company, as a consequence of which it is liable for the payment of the multiple store license fees thereon as contended by the state. The Supreme Court of the United States in *State Board of Tax Commissioners v. Jackson,* and *Liggett v. Lee, supra,* in commenting upon the essential differences between individual stores and chain stores, which were held to validate the classification for the type of taxation here under consideration, also recognized a further distinction between the latter and voluntary cooperative association of individual stores which, it is said, could not be classified as an orthodox integrated chain store

system. The same differentiation was observed in the cases of the *Safeway Stores Co. v. Portland,* 149 Ore. 581, 42 P. (2d) 162, and *Hurt v. Cooper,* 130 Tex. 433, 113 S. W. (2d) 929. On this subject it was said in *Liggett v. Lee, supra:* ''While incidents of the operation of the one may be quite similar to those found in the other, there is a clear distinction between one owner operating many stores and many owners each operating his own store with a greater or less measure of cooperation voluntarily undertaken.''

██ The opinion in the Jackson case, supra, contains the following: ''With respect to associations of individual stores for purposes of cooperative buying, exchange of ideas as to advertising, sales methods, etc., it need only be remarked that these are voluntary groups, and that series of independent units cannot, in the nature of things, be as efficiently and successfully integrated as a chain under a single ownership and management.'' On the basis of this distinction the company further argues that the agency stores should be classified as a cooperative association and not as a chain store group.

We perceive nothing that savors of a voluntary cooperative association in the relationship portrayed by the record. The element of mutuality between the agency store operators, fundamental in a true cooperative association, is wholly lacking. Each agency store, like a satellite traveling in its independent orbit, primarily is guided by the planetary influence of the company. The buying of the merchandise by the agency stores from the company at prices and upon terms fixed by it, is not comparable with cooperative buying which implies a common buying association under the joint control of the members of the association. There is here no semblance of a cooperative organization of the agency store operators for the exchange of ideas, sales methods, etc., but in contrast to such an arrangement the prevailing policy with respect to these matters is conceived and promulgated by the company alone.

436

Accordingly, the judgment is reversed and the cause remanded with directions to enter judgment in favor of the state treasurer against the company for license fees on the "Gamble Agency Stores" upon the basis of the stipulated number operated for the years involved.

MR. JUSTICE FRANCIS E. BOUCK not participating.