(No. 6878.   November 5, 1941)

STATE OF IDAHO, on relation of, formerly, Byron Defenbach, now, GEORGE W. WEDGWOOD, Tax Commissioner of the State of Idaho, and CALVIN E. WRIGHT, State Auditor of the State of Idaho, Respondent, v. GAMBLE-SKOGMO, INC., a corporation, Appellant.

(120 Pac. (2d) 630)

Rehearing denied January 15, 1942.

Richards & Haga, for Appellant.

Bert H. Miller, Attorney General, and J. R. Smead, Leo Bresnahan, Robert M. Kerr, Jr., M. Casady Taylor, Assistant Attorneys General, for Respondent.

HOLDEN, J.—Appellant, a Delaware corporation with its principal place of business in Minnesota, has a uniform contract[1] with twenty-eight individually operated stores

_____

[1] "Location ......................................... Owner ...........................................

### Contract for Sale of Merchandise
### at Wholesale

THIS AGREEMENT Made this ............ day of ................................, 193......, between  Gamble-Skogmo, Inc., a Delaware corporation having its principal office and place of business in Minneapolis, Minnesota, as party of the first part and hereinafter called the Wholesaler, and ........................................... of ........................................... who has established and owns or will establish and own a retail store at ................................................... as party of the second part and hereinafter called Retailer,

WITNESSETH:

THAT For the consideration and agreements herein expressed the parties agree as follows:

1.   The Wholesaler:

(a)   Agrees to sell to the Retailer at prices to be established from time to time by the Wholesaler, such merchandise as the Wholesaler regularly carries for sale in its stores.

(b)   Agrees to adjust to the Retailer for any of such merchandise so sold which in the opinion of the Wholesaler is or was defective at the time of sale.

(c)   Grants to the Retailer the right to paint his store with the distinguishing blue and orange colors used by the Wholesaler on its stores.

(d)   Upon request of the Retailer, agrees to advise such Retailer relative to methods of merchandising and upon request and payment for same by the Retailer, agrees to furnish to the Retailer circulars and other advertising of the same general character as the Wholesaler uses in its stores.     .

2.   The Retailer:

(a)   Unless otherwise authorized in writing, shall buy merchandise purchased from the Wholesaler from the Wholesaler's store at ................................. and shall pay for the same cash on delivery. If merchandise is shipped direct from the Wholesaler's warehouse

or other sources, the Retailer shall pay therefor cash in advance before shipment.

(b) Shall constantly display the merchandise bought from the Wholesaler in the store windows and display and advertising cases of the Retailer. The Retailer shall also exercise his best efforts and facilities to establish, maintain, and increase the sale of merchandise purchased from the Wholesaler.

(c) Shall have the right to use the name 'Gamble Store Agency' merely to designate that his store is selling merchandise purchased from the Wholesaler by the Retailer. The Retailer shall not use the words 'Gamble Stores' only, nor shall the Retailer use any word, sign or symbol on or in his store nor shall he do any act or thing during the term of this contract which in any way shall or will designate such store as being either owned, controlled, supervised, operated, or managed by the Wholesaler; nor shall the Retailer have any right to make any contract, agreement, or obligation for or on behalf of the Wholesaler either as Agent or otherwise.

(d) Upon the termination of this contract shall remove all signs, marks, words and/or colors distinguishing such store as a 'Gamble Store Agency' store; and if painted with the colors above referred to, the Retailer shall repaint the same so as to remove all distinguishing colors or marks which are used by the stores owned and operated by the Wholesaler.

(e) Shall in order to provide insurance protection to the Wholesaler for fixture loans and for merchandise furnished under a Floor Plan Trust Receipt permit the Wholesaler to arrange insurance coverage for the account of both on the merchandise and fixtures to be used in the operation of said store under the plan available through the Wholesaler and the Retailer shall reimburse the Wholesaler for any amounts paid or advanced by the Wholesaler for such coverage.

3. Is is further mutually agreed:

(a) That this contract shall be and remain in force until terminated as herein provided.

(b) That this contract may be terminated by either party on thirty (30) days written notice to the other, either personally or by registered mail.

(c) The Retailer shall not be in any manner or respect the legal representative or agent of the Wholesaler and shall not enter into or create any contract, agreement, or obligation on the part of the Wholesaler either expressed or implied; nor bind the Wholesaler in any manner or respect whatsoever; it being understood that this is a contract for the sale of merchandise only and that the Retailer shall have the right to use the words 'Gamble Store Agency' only for the purpose of advertising that the Retailer is selling merchandise purchased from the Wholesaler.

(d) The trademarks, 'Gamble Store Agency,' 'Gamble Stores,' 'Coronado,' 'Tiger' and 'Crest' are the exclusive property of the Wholesaler and upon the termination of this contract for any

within the state. This suit was instituted to collect from appellant the license tax as authorized by Chapter 113 of the 1933 Session Laws, page 179, as provided by sections 1, 2, 5 and 7 thereof.[2] The sole question involved is

reason the Retailer shall immediately discontinue the use of such trademarks, signs, and terms and shall immediately cease to advertise or designate his store as a 'Gamble Store Agency' and will remove from such store all marks, signs, advertising, and symbols which would give such store the appearance of being a 'Gamble Store Agency' store and upon failure to do so the Wholesaler's representatives or agents shall have the full right to remove such signs, trademarks, or other advertising.

(e)  That the retailer is an independent merchant who does and shall during the entire term of this contract, solely, own, control, manage, and supervise his own store.

IN WITNESS WHEREOF The parties have executed this agreement in triplicate on the day and year first above written.

GAMBLE-SKOGMO, INC.

In Presence of:

By ------------------------------------------------

-------------------------------------------------- 
President, Vice-President

As to Wholesaler

or Secretary

-------------------------------------------------- 
----------------------------------------------------"

As to Retailer

Retailer

[2] "Section 1.  That from and after the first day of July, 1933, it shall be unlawful for any person, firm, corporation, association or co-partnership, either foreign or domestic, to operate, maintain, open or establish any store in this state, without first having obtained a license so to do from the Commissioner of Finance, as hereinafter provided.

Sec. 2.  Application for License to Commissioner of Finance— Fees: Any person, firm, corporation, association or co-partnership desiring to operate, maintain, open or establish a store in this state, shall apply to the Commissioner of Finance for a license so to do. The application for a license shall be made on a form which shall be prescribed and furnished by the Commissioner of Finance, and shall set forth the name of the owner, manager, trustee, lessee, receiver or other person desiring such license; the name of such store, and such other facts as the Commissioner of Finance may require.

If the applicant desires to operate, maintain, open or establish more than one such store, he shall make a separate application for a license to operate, maintain, open or establish each such store but, the respective stores for which the applicant desires to secure licenses, may all be listed on one application blank.

Each such application shall be accompanied by a filing fee of fifty cents ($.50) and by the license fee as prescribed in Section five (5) of this Act.

whether or not appellant "controls" these stores within the meaning of the quoted statute. The appeal is from a judgment of the district court adverse to appellant.

Appellant urges there is no control as to premises, equipment, or merchandise (after it is sold to and purchased by the retail stores), no sharing by appellant in profits or losses, no dictation as to employees, investment, purchasing merchandise from others, terms of sale by the retailer, prices, management, display and design, advertising, quota, valuation of trade-in merchandise, financing, cancellation, threats, accounting, reports, store numbers, conditional sales, character of business and catalogue; hence, there is an entire absence of control.

Nevertheless, it is obvious that a substantial advantage was considered to accrue mutually to appellant and these individual stores, though not in the same way or

Sec. 5. Annual License Fees.—Every person, firm, corporation, association or co-partnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this state, under the same general management, supervision or ownership, shall pay the license fees hereinafter prescribed, for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments.

The license fee herein prescribed shall be paid annually, and shall be in addition to the filing fee prescribed in Sections two (2) and four (4) of this Act.

The license fees herein prescribed shall be as follows:

1.—Upon one store the annual license fee shall be five dollars for each such store;

2.—Upon two stores the annual license fee shall be ten dollars for each such store;

3.—Upon three stores the annual license fee shall be twenty dollars for each such store;

4.—Upon four stores the annual license fee shall be thirty-five dollars for each such store;

5.—Upon five stores the annual license fee shall be fifty-five dollars for each such store;

6.—Upon six stores the annual license fee shall be eighty dollars for each such store;

7.—Upon seven stores the annual license fee shall be one hundred ten dollars for each such store;

8.—Upon eight stores the annual license fee shall be one hundred forty dollars for each such store;

9.—Upon nine stores the annual license fee shall be one hundred seventy dollars for each such store;

in the same degree. In other words, the situation is designedly different than if appellant either through the mail or by personal representatives sold fixtures and merchandise to the stores as an ordinary wholesaler, in that paragraph "1(c)" permits the retailer to paint store with distinguishing blue and orange colors used by the appellant on stores admittedly owned and controlled by it. Paragraph "2(b)" requires the retailer to *constantly* (emphasis ours) display the merchandise bought from the appellant in the store windows and display and advertising cases of the retailer. Paragraph "2(c)" grants and at the same time restricts the use the retailer may make of the name "Gamble Store Agency." This immediately links, no doubt for its advertising value, the individual stores with the Gamble Stores. It is a special privilege which is not granted expect by the specific terms

10.—Upon ten stores the annual license fee shall be two hundred dollars for each such store;

11.—Upon eleven stores the annual license fee shall be two hundred thirty dollars for each such store;

12.—Upon twelve stores the annual license fee shall be two hundred sixty dollars for each such store;

13.—Upon thirteen stores the annual license fee shall be two hundred ninety dollars for each such store;

14.—Upon fourteen stores the annual license fee shall be three hundred twenty dollars for each such store;

15.—Upon fifteen stores the annual license fee shall be three hundred fifty dollars for each such store;

16.—Upon sixteen stores the annual license fee shall be three hundred eighty dollars for each such store;

17.—Upon seventeen stores the annual license fee shall be four hundred ten dollars for each such store;

18.—Upon eighteen stores the annual license fee shall be four hundred forty dollars for each such store;

19.—Upon nineteen stores the annual license fee shall be four hundred seventy dollars for each such store;

20.—Upon each store in excess of nineteen the annual license fee shall be five hundred dollars for each such store.

Sec. 7. Parties to Which Act Applies: The provisions of this Act shall be construed to apply to every person, firm, corporation, association or co-partnership, either domestic or foreign, which is controlled or held with others by a majority stock ownership or ultimately controlled or directed by one management or association of ultimate management. Provided, however, that this Act shall not apply to gasoline filling stations and/or gasoline distributing plants handling gasoline or other petroleum products exclusively."

of the contract. Paragraph "2(d)" provides that upon the termination of the contract the retailer shall remove all signs, marks, words and/or colors distinguishing such store as a Gamble Store Agency store; and if painted with the colors above referred to, the retailer shall repaint the same so as to remove all distinguishing colors or marks which are used by the stores owned and operated by the wholesaler, from which it is rather clear that appellant intended to, and actually did, secure more numerous and sure outlets than it could have in the absence of such a contract.

The supreme Court of Colorado in *Bedford v. Gamble-Skogmo, Inc.*, 104 Colo. 424, 91 P. 2d 475, construed a Gamble-Skogmo contract identical with the Gamble-Skogmo contract in the case at bar, with certain exceptions. The contract construed by the Colorado Court provided, among other things, that

"(f)   In consideration of the agreement herein contained, the Retailer gives to the Wholesaler, upon the termination of this agreement by cancellation by either party or otherwise, an option to buy from the Wholesaler at the Wholesaler's current wholesale selling prices of such products and/or also an option to purchase any or all of the fixtures in the Retailer's store at the current replacement. cost thereof, less reasonable depreciation; and/or an option to take over the unexpired terms of any existing leases covering the store building in which the Retailer does business at the time of such termination. In case of exercising such last option, the Retailer agrees to sign over to the Wholesaler or to whomsoever it directs any such lease or leases."

While the Idaho contract does not contain the provisions above quoted, it does contain the following:

"2(e)   [The Retailer] Shall in order to provide insurance protection to the Wholesaler for fixture loans and for merchandise furnished under a Floor Plan Trust Receipt permit the Wholesaler to arrange insurance coverage for the account of both on the merchandise and fixtures to be used in the operation of said store under the plan available through the Wholesaler and the Retailer shall re-

imburse the Wholesaler for any amounts paid or advanced by the Wholesaler for such coverage."

The trust receipt, referred to in paragraph "2(e)," follows:

"...................................................Gamble Store Agency No. ...........
  (Town)    (State)    (Date)

No. 115316

## VENDOR TRUST RECEIPT

258
ORIGINAL

Received from Gamble-Skogmo, Inc., through Gamble Store No. ................. at ........................... vendor and owner, the merchandise hereafter described, complete with all attachments, to be held for them for sale and held in trust for that purpose at my Agency Store. Upon sale of any such item, I agree to deliver immediately to above Gamble Store the amount stated opposite such item herein, which shall be kept separate from my own funds. Same to be held at my risk against all hazards and I agree to return such item to vendor on demand in same condition as received, but have privilege of using same for display and demonstration. If vendor is put to any expense in reclaiming or in any way protecting its title to such property or proceeds of sale thereof, I agree to pay any and all such expenses. Title to such item to remain in vendor until sold to actual bona fide purchaser for cash or on conditional sales contract.

Said merchandise is described as follows:

| ITEM | MODEL | SERIAL NO. | AMOUNT TO BE REMITTED |
|------|-------|-----------|----------------------|
| | | | $.......................... |

Witness

_____          _____
                                          Owner, Gamble Store Agency

For value received; the within Vendor Trust Receipt, and all rights of vendor and owner thereunder to the item therein named is hereby assigned to First Bancredit

Corporation of St. Paul, Minn., subject to special agreement.

GAMBLE STORE NO. ........ City..........

By ------------------------------------------------------

Manager

For Gamble-Skogmo, Inc.

Form G-316-B''

By paragraph "2(e)" of the Idaho contract it is provided that Gamble-Skogmo, Inc., hereinafter called the wholesaler, shall, through a plan designated "floor plan trust receipt," make loans available to local owners for the purchase of both fixtures and merchandise "to be used in the operation of said [local] store," and that "in order to provide insurance protection to the wholesaler for fixture loans and for merchandise" loans, the wholesaler is authorized "to arrange insurance coverage for the account of both [wholesaler and owner] on the merchandise and fixtures" and that "the retailer shall reimburse the wholesaler for any amounts paid or advanced by the wholesaler for such coverage."

It will be noted that by the terms of the trust receipt, above quoted, title is retained by the wholesaler to both fixtures and merchandise, or either, as the case may be, sold to the local owner. Hence, the question at once arises as to whether the wholesaler is given more, or less, control and supervision under the Idaho contract than under the Colorado contract. Under the Colorado contract the wholesaler, upon cancellation, was given the option to purchase all the saleable merchandise as well as "all or any of the fixtures in the retailer's store," and to take over the unexpired terms of any existing leases covering the building in which the store was operated. While that is true, under the "trust receipt" given pursuant to and as expressly provided for by the terms of paragraph "2(e)" of the Idaho contract, title to both fixtures and to merchandise, as above pointed out, is expressly reserved in the wholesaler, thus making an option to either purchase, or lease, as in the Colorado contract, wholly unnecessary. So that, to say the least, the wholesaler has as much control and supervision over a local store under

the Idaho contract as it was given under the Colorado contract.

█ The blank form of assignment printed at the foot of the "Vendor Trust Receipt" is not a part of the contract in that the same is not made a part of either paragraph "2(e)" or the "Vendor Trust Receipt" by reference or otherwise. Therefore, the obligation of the wholesaler to finance local owners is not affected thereby. Hence, it is unnecessary to discuss or consider the effect of an assignment of the "Vendor Trust Receipt" by the wholesaler to the First Bancredit Corporation.

Since the pertinent sections of the Idaho and Colorado statutes, as well as the pertinent parts of the contracts, business practices and policy, are substantially the same, the reasoning of the Colorado Supreme Court in holding that Gamble-Skogmo Agency Stores were chain stores within the meaning of the Colorado chain store statute, is applicable to the instant case. We quote:

"To avoid the implications arising from the uniformity in the business practices and sales policies of the agency stores, well recognized characteristics of chain store operation, the company [appellant here] points out [as in the case at bar] that under the contract the agency store operators were not compelled or obligated to avail themselves of the various services and advantages offered by the company, and says that the circumstance that the agency owners were generally willing to follow suggestions as to how to make a success of their business, does not indicate that they are legally controlled by the company.

"Notwithstanding this contention, we are compelled to believe that on the one side there is an intimacy of regulation and on the other a fullness of submission which imports ultimate control in the company."

In a lucid and convincing analysis, the Colorado court continues:

"An examination of the contract, even with its express proclamation [carried into the Idaho contract] that the agency store operator is 'an independent merchant,' and its repeated disclaimers of the relationship of principal

and agent between the company and the agency stores, in the light of the method of operation as disclosed by the evidence, makes irresistible the conclusion that the purpose of the contract was to initiate a system from which both parties would reap all the advantages of chain store operation with immunity from the burdens thereof."

In 1931 the Supreme Court of the United States, in declaring constitutional an Indiana chain store tax act (*State Board of Tax Commissioners v. Jackson*, 283, U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, 85 A. L. R. 1536) determined that the chain store has many features and advantages which definitely distinguish it from the individual store dealing in the same commodities, namely;

"quantity buying, which involves the application of the mass process to distribution, comparable to the mass method used in production; buying for cash and obtaining the advantage of a cash discount; skill in buying, so as not to overbuy, and at the same time keep the stores stocked with products suitable in size, style and quality for the neighborhood customers who patronize them; warehousing of goods and distributing from a single warehouse to numerous stores; abundant supply of capital, whereby advantage may be taken of opportunities for establishment of new units; a pricing and sales policy different from that of the individual store, involving slightly lower prices; a greater turn-over, and constant analysis of the turn-over to ascertain relative profits on varying items; unified, and therefore cheaper and better advertising for the entire chain in a given locality; standard forms of display for the promotion of sales; superior management and method; concentration of management in the special lines of goods handled by the chain; * * * standardization of store management, sales policies and goods sold."

The Court held these distinctions afforded a valid basis of classification for the imposition of the tax upon the operation of mercantile establishments graduated according to the number of stores operated. The contract and evidence in the case at bar disclose that many, if not all, the above stated characteristics apply to Gamble Store

Agencies in Idaho. Mr. Justice Roberts, author of the majority opinion in the Jackson case, supra, later said in *Liggett Co. v. Lee*, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699:

"The decision in the Jackson case was based, not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store."

■ It is apparent the Idaho contract was cleverly and adroitly drawn and the stores operated for the purpose of obtaining and enjoying all the benefits to be had from chain store supervision and control. It is also apparent these stores were intended to constitute a chain for every purpose but the payment of the tax.

For the reasons hereinbefore stated the judgment appealed from must be, and it is hereby, affirmed. Costs awarded to respondent.

Givens, J., and Morgan, J., concur.

Ailshie, J., dissents.

BUDGE, C.J., Dissenting.—I am not able to concur in the majority opinion as it is written for the reason that it is too broad and if the principles announced therein are carried to their logical conclusion, it would defeat the very purpose of the statute and result in injury rather than a benefit to those for whom the statute was apparently enacted.