STATE ex rel., RODDEWIG, Respondent, v. KUTCHER, et al, Appellants

(2 N. W.2d 669.)

(File No. 8480. Opinion filed March 4, 1942.)
Rehearing Denied May 5, 1942.

**Davenport & Evans** and **Louis R. Hurwitz,** all of Sioux Falls, for Appellants.

**Leo A. Temmey,** Atty. Gen., and **Benj. D. Mintener** and **H. O. Lund,** Asst. Attys. Gen., for Respondent.

SMITH, J. The narrow questions presented on this appeal arise under Chapter 242 of the Session Laws of 1937, a chain store tax act. The pertinent provisions of the act are as follows:

"Section 5. Every person, firm, corporation, association or copartnership opening, establishing, operating, maintaining one or more stores or mercantile establishments within this state under the same general management, supervision or ownership shall pay the license fees hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The annual license fee prescribed herein shall be as follows: (1) Upon one store, the annual license fee shall be one dollar for each such store; (2) upon two stores, or more, but not to exceed five stores, the annual license fee shall be five dollars for each such additional store; (3) upon six stores or more, but not to exceed ten stores, the annual license fee shall be fifteen dollars for each such additional store; (4) upon each store in excess of ten, but not to exceed fifteen, the annual license fee shall be twenty-five dollars for each such additional store; (5) upon each store in excess of fifteen and not to exceed twenty stores, the annual license fee shall be fifty dollars for each such additional store; (6) upon each store in excess of twenty, but not to exceed thirty stores, the annual license fee shall be one hundred dollars for each such additional store; (7) upon each store in excess of thirty, but not to exceed forty stores, the annual license fee shall be two hundred dollars; (8) upon each store in excess of forty, the annual license fee shall be two hundred fifty dollars for each additional store."

"Section 7. The provisions of this Act shall be construed to apply to every person, firm, corporation, copartnership or association, either domestic or foreign, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

"Section 8. The term 'store' as used in this Act shall be construed to mean and include any store or stores or any

mercantile establishment or establishments which are own-
ed, operated, maintained and/or controlled by the same
person, firm, corporation, copartnership or association, eith-
er domestic or foreign, in which goods, wares or merchan-
dise of any kind, are sold at retail."

A similar act was attacked as repugnant to the 14th Ar-
ticle of Amendment of the Constitution of the United States
in State Board of Tax Commissioners of Indiana et al. v.
Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A.
L. R. 1464, 75 A. L. R. 1536. It was held that a Legislature
may make the difference in method and character of the
business of chain stores the basis of classification for taxa-
tion. In reiterating this view in Louis K. Liggett Company
et al. v. Lee et al., 288 U. S. 517, 53 S. Ct. 481, 484, 77 L. Ed.
929, 85 A. L. R. 699, that court said: "In their endeavor thus
to distinguish the earlier case, the appellants stress mere
details, but ignore the underlying reason for sustaining the
classification there attacked. The decision in the Jackson
case was based, not upon any single feature of chain store
management, but upon the ultimate fact of common know-
ledge, illustrated and emphasized by the evidence, that the
conduct of a chain of stores constitutes a form and method
of merchandising quite apart from that adapted to the prac-
tice of the ordinary individually operated small store or de-
partment store; and that the difference between an inte-
grated and a voluntary chain is fundamental. While inci-
dents of the operation of the one may be quite similar to
those found in the other, there is a clear distinction between
one owner operating many stores and many owners each
operating his own store with a greater or less measure of
co-operation voluntarily undertaken. The Legislature may
make the distinction the occasion of classification for pur-
poses of taxation. Neither similarity of opportunities and
advantages in some aspects, nor the fact that the one kind
of store competes with the other, is enough to condemn the
discrimination in the taxes imposed. It is needless to repeat
what was said in the Jackson case to the effect that the dif-
ference between the subjects taxed need not be great, and

that, if any reasonable distinction can be found, the duty of the court is to sustain the classification embodied in the law."

Similar acts have been sustained as against attack under the constitutions of various states. 73 A. L. R. 1481, 85 A. L. R. 736, and Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U. S. 412, 57 S. Ct. 772, 81 L. Ed. 1193, 112 A. L. R. 305.

■ The subject of classification for purposes of taxation under Section 17, Article VI of the Constitution of South Dakota was treated exhaustively by this court in State ex rel. Botkin et al. v. Welsh, Director of Taxation et al., 61 S. D. 593, at 638, 251 N. W. 189, at 209. For the reasons there set forth, which we are not justified in reproducing here, we hold the basis of classification for taxation adopted in the cited legislation to be "reasonable and related to the subject in hand" and therefore permissible under the Constitution of our State.

In their appeal from the judgment of the trial court requiring the defendants to pay a license tax under the provisions of the act, defendants present but three propositions which they phrase as follows: (1) The act, fairly analyzed, does not apply to defendants; (2) if deemed to apply to the defendants, the act would be unconstitutional in that there would be no reasonable basis for exaction of the stipulated fees; (3) as applied to the defendants the act is so indefinite as to be entirely unenforceable.

The facts are stipulated and reveal that the individual defendants L. J. Kutcher, Joe Kutcher, and M. A. Marks of Sioux City, Iowa, own all of the capital stock and constitute the board of directors and officers of the "Dakota Distributing Company", a South Dakota Corporation, a wholesale merchandising concern which maintains its offices and warehouses at Sioux City, Iowa, and individually carry on at that place what is known as the "Service Agency", the activities of which are particularly described in a portion of the Stipulation presently to be quoted. Of the total sales of the Dakota Distributing Company, 82% are made to the twenty-three corporate defendants and to three like corpora-

tions operating in another state. The corporate defendants are organized as separate South Dakota corporations and own retail stores handling general lines of merchandise located in the cities named, in their respective corporate names. A majority of the capital stock in every one of these corporate defendants is owned by L. J. Kutcher, Joe Kutcher and M. A. Marks, or by the Dakota Distributing Company above named. Ignoring the unexplained and insignificant stockholdings of one Beulah Marks, Bill Kutcher and A. Goodsite, each of these separate corporate defendants has a minority stockholder who, with but two exceptions, owns no stock in any other of the corporate defendants. In two instances a minority stockholder is shown to own a small block of stock in one of the other corporate defendants. The board of directors of the corporate defendants, in each instance, is made of two of the individual defendants, Kutcher, Kutcher and Marks, one of which is the Vice President and the other the Secretary-Treasurer, and the minority stockholder who is the President and is also named as the manager of its store.

The method of carrying on the business of these retail stores is described in the stipulation as follows: "The President of the corporation acted as manager of the store. Salaries paid to such Presidents and Managers varied from $100.00 to $250.00 a month, according to the size of the business involved. The number of employees at the various stores, exclusive of the President and Manager, varied from three to fifteen and wages paid to such other employees were from Fifty Dollars to One Hundred Dollars a month. Part of the purchases were made through what was known as a Service Agency conducted at Sioux City. This Service Agency was under the supervision of L. J. Kutcher, Joe Kutcher, and M. A. Marks. Each of the Defendant corporations turned over to this Service Agency two (2) percent of the total amount of gross sales, doing so periodically. The purchases made for the different corporations by this Service Agency were handled in the manner hereinafter stated. Also, this Service Agency kept the bulk of the books and records for the individual corporations. Every President

and Manager of each of the Defendant corporations render-
ed a report to this Service Agency every other day except
that in the case of five of the largest stores, such reports
were made daily. This report included a report of gross
purchases, sales, etc. and on the basis of such reports rec-
ords were kept by the Service Agency. Also, every Satur-
day night each President and Manager of each corporation
made out and forwarded to the Service Agency a report of
the purchases which were necessary to maintain the stock
in trade and which purchases were desired to be made
through the Service Agency. On the basis of such reports,
the Service Agency proceeded to make the required pur-
chases and the deliveries were made through a trucking
service maintained by Dakota Distributing Company. Oc-
casionally other transportation facilities were used to make
such deliveries but the ordinary practice was to use the
trucks of the Dakota Distributing Company. The Service
Agency made the bulk of the purchases which it handled
from the Dakota Distributing Company but a portion thereof
were from other wholesale houses or dealers. Also, in addi-
tion to the purchases made through the Service Agency each
of the Defendant corporations, through its President and
Manager, and to the extent hereinafter stated, made other
purchases. All meats, men's clothing, dairy products, and
bulk of fresh fruits and fresh vegetables were purchased by
the Defendant corporations through the Presidents and Man-
agers thereof independently of such Service Agency. The
two (2) percent of gross receipts paid by the respective
Defendant corporations to the Service Agency was designed
to cover the cost of operating the service. Of the total aver-
age volume of purchases of the various Defendant corpora-
tions, approximately fifty (50) to sixty (60) percent were by
the Service Agency from the Dakota Distributing Company.
Approximately twenty (20) percent through the Service
Agency, and some other wholesale concerns or dealers, and
approximately twenty (20) percent independently by the
corporations through the Presidents and Managers. The
service rendered by the Service Agency included inspections
of the various stores by one Bill Kutcher who was employed

by the Service Agency and who devoted practically all of his time to trips to the localities where the various stores operated for the purpose of making inspections, suggestions, etc. Also, both L. J. Kutcher and Joe Kutcher from time to time visited the various stores. There was no uniformity in such visits but each planned to visit each of the stores several times a year. There was no uniformity in retail price scales maintained, these varying as affected by local competition and other conditions. The retail price schedules were fixed by the President and Manager of each corporation but always subject to the right of the other Directors to supervise and change such price schedules if not satisfactory. There was not maintained any uniformity as to types of stores, such as methods of display, store fronts maintained, etc. but all used the name 'K & K.' Advertising and publicity was ordinarily prepared by the Service Agency in consultation with the President and Manager. The Service Agency also sponsored radio broadcasts advertising the stores, this being paid for as part of the service rendered by the Service Agency. As to kinds of merchandise that was handled and sold by Dakota Distributing Company, the various Defendant corporations made the bulk of their purchases of such kinds of merchandise through the Service Agency and from Dakota Distributing Company. However, the various Defendant corporations, or some of them, from time to time, and through the President and Manager, made such purchases of such kinds of merchandise independently and from other wholesalers or distributors, or other dealers. Advance approval of such transactions was not required but all were subject to the general supervision and control of the respective Boards of Directors. * * * The corporate records of the Defendant corporations such as Minute Books, Stock Books, Dividend Records, By-Laws, Articles of Incorporation, etc. are kept at offices in a building at Sioux City, which building is also occupied by the Dakota Distributing Company and the Service Agency."

The first two propositions of defendant are predicated upon the premises (a) that the act reveals an intention to impose a tax if the exhibited merchandising units are un-

der both common management and common control, (b) that if the act be construed as imposing a license under Section 5, supra, under a state of facts showing only common control, and in which the element of common management is not established, it must be held to be repugnant to the Federal and State Constitution because there is no discernible difference between such stores and "many owners each operating his own store with a greater or less measure of cooperation voluntarily undertaken," and (c) that the stipulated facts fail to establish the fact of common management and supervision. It is manifest that these contentions fail if common management and control are established by the stipulation.

We think common ultimate management of the stores of the corporate defendants must necessarily be inferred from the stipulated facts. The stipulation cannot be read as a whole in the light of reason without concluding that L. J. Kutcher, Joe Kutcher, and M. A. Marks are revealed as acting in concert through their Service Agency, and its supervising officer Bill Kutcher, and their juristic alter ego, the Dakota Distributing Company, and as directors and officers of the individual corporate defendants, as the ultimate operators and common managers of the stores of a firmly integrated merchandising system or chain. To fail to so understand the stipulation, in our opinion, one must blind oneself to realities, and while looking at the trees, fail to see the forest.

In contending that the stipulation describes separately owned stores indulging in voluntary cooperation in but phases of their business, defendants point out details of operation of the individual stores. They call attention to the discretion exercised by local managers in buying portions of the merchandise and in pricing, instances of variation in method and merchandise between stores, to the fact that each unit is owned by a separate corporation, and that there is unrelated individual ownerships of blocks of capital stock in these several corporations. These are mere details which pale in significance as soon as one looks at the over-

all situation. Viewing the situation as a whole, we find concentrated in the hands of Messrs. Kutcher, Kutcher and Marks instruments of absolute control and unmistakable evidence that they are acting in concert through agencies set up for that purpose. We find them amassing and conducting 80% of the buying, attending to all of the accountancy and advertising of the group, maintaining constant over-all supervision through a traveling agent and their individual visits from store to store, and receiving daily reports of operators. These are the badges of general management. The details pointed to by defendants appear to us as evidencing no more than delegation of some measure of authority to a local manager, and a variation of method in each store to meet local conditions. Competent local management is essential to the success of this modern system of merchandising, and we see the permitted ownership of stock in a particular unit as but a means of interesting and holding competent help. The pattern is that of a chain. It makes no difference that the fabricator saw fit to forge its links as separate corporations. A unified system was created and cooperation throughout that system, in our opinion, is neither coincidental nor voluntary. We conclude, therefore, that the act, fairly construed, applies to defendants, and that all of the elements which have been held to distinguish a chain of stores from the separately owned store, and to warrant separate classification for the purposes of taxation, are reflected by the stipulation.

In dealing with records in which the evidence of singleness of control and management was much less substantial, and under almost identical statutory provisions, in Bedford, State Treasurer, et al. v. Gamble-Skogmo, Inc., 104 Colo. 424, 91 P.2d 475, 480, it was said: "We perceive nothing that savors of a voluntary cooperative association in the relationship portrayed by the record. The element of mutuality between the agency store operators, fundamental in a true cooperative association, is wholly lacking. Each agency store, like a satellite traveling in its independent orbit, primarily is guided by the planetary influence of the company.

The buying of the merchandise by the agency stores from the company at prices and upon terms fixed by it is not comparable with cooperative buying which implies a common buying association under the joint control of the members of the association. There is here no semblance of a cooperative organization of the agency store operators for the exchange of ideas, sales methods, etc., but in contrast to such an arrangement the prevailing policy with respect to these matters is conceived and promulgated by the company alone." And in Gulf Refining Co. v. Fox, D. C., 11 F. Supp. 425, 429, it was said: "We are unable to follow this line of argument, for it seems to us that all of these benefits flow from the practical operation of the plan which the plaintiff company has adopted. It may be conceded that it does not exercise full control over all of the actions of the dealers in a strict legal sense, but its actual control is so effective that little room is left for independent action on their part, while full enjoyment of the advantages inherent in a chain store system on its part is ensured."

██ The third contention is predicated on the assumption that the act imposes a separate license tax upon each of the individual stores, and furnishes no basis for determining the amount of tax each particular store must pay. We think this contention arises from misinterpretation. By Section 5 it is provided, "Every person * * * operating * * * one or more stores * * * shall pay * * *." We gather an intention from this language to charge the operator of the chain with a tax to be measured by the number of stores conducted under the common management or control. As indicated, supra, we think the stipulation reveals the individuals Kutcher, Kutcher, and Marks, as the operators of these stores under one management, supervision or control, and under the plain terms of the act they are required to pay the license fees as the price of that privilege.

The judgment of the trial court is affirmed.

All the Judges concur.