ALONZO P. TUKEY, APPELLEE, v. CITY OF OMAHA ET AL., APPELLANTS.

FILED MARCH 17, 1898. No. 7877.

1. **Municipal Corporations:** INCURRING DEBT. When the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly followed, and the terms of the authority granted must be strictly and fully performed.

2. ———: ———: BONDS: MARKET HOUSE. A proposition was submitted to the electors of a city, and by them adopted, to issue bonds for the purpose of securing a site for a market place and erecting thereon a market house. The proposition contemplated the purchase of land for that purpose. *Held,* That the erection of a market house on land already owned by the city and used as a public park was a substantial departure from the terms of the vote, and was unauthorized.

3. ———: ———: INJUNCTION. A resident taxpayer, showing no private interest, may maintain a suit to restrain the governing body of a municipality from an illegal disposition of the public money, or the illegal creation of a debt which must be paid by taxation.

APPEAL from the district court of Douglas county. Heard below before HOPEWELL and FERGUSON, JJ. Affirmed.

The opinion contains a statement of the case.

*William J. Connell* and *Estabrook & Davis*, for appellants:

The undisputed testimony shows that the block of ground in controversy had been dedicated to the public by a common-law dedication for the purposes of a public square, and that there never has been a dedication, statutory or otherwise, of such property as a public park. The legislature so far represents the public that it may at any time change or abolish the original use. (*Brown v. Manning*, 6 O. 298; *State v. Trask*, 27 Am. Dec. [Vt.] 561; *Mowry v. City of Providence*, 10 R. I. 52; *City of Hoboken v. Pennsylvania R. Co.*, 8 Sup. Ct. Rep. 643.)

The legislature may delegate to a municipality the power to change or abolish the original use. (*Whitsett v. Union D. & R. Co.*, 10 Colo. 243; *Polack v. San Francisco*, 48 Cal. 490; *State v. Huggins*, 47 Ind. 586; *Riggs v. Board of Education*, 27 Mich. 262; *Cooper v. City of Detroit*, 42 Mich. 584; *Clarke v. City of Providence*, 15 Atl. Rep. [R. I.] 763; *City of Fort Wayne v. Lake Shore & M. S. R. Co.*, 132 Ind. 558; *Baird v. Rice*, 63 Pa. St. 489; *Heller v. Atchison, T. & S. F. R. Co.*, 28 Kan. 446.)

The legislature has expressly conferred the power upon the city of Omaha to extinguish one public use to which property has been dedicated, for the purpose of devoting such property to another and different public use. (*Lindsay v. City of Omaha*, 30 Neb. 517; *Whartman v. City of Philadelphia*, 33 Pa. St. 202; *Reid v. Board of Education*, 73 Mo. 295; *Langley v. Galliopolis*, 2 O. St. 108.)

Persons purchasing property abutting upon grounds dedicated to a public use, on the faith of such dedication, thereby acquire a vested interest in the continuance of such use, and not even the legislature can extinguish the particular use without the consent of such abutting own-

ers or compensating them in damages; but only such persons may·be heard to complain, and the appellee owning no property abutting upon, or contiguous to, Jefferson Square has no such personal interest, as a mere taxpayer, as will authorize him to sue. (*City of San Antonio v. Strumberg*, 70 Tex. 366; *City of Chicago v. Union Building Ass'n*, 102 Ill. 379; *Gall v. City of Cincinnati*, 18 O. St. 563; *Marini v. Graham*, 8 Am. & Eng. Corp. Cases [Cal.] 401; *Kittle v. Fremont*, 1 Neb. 329.)

*George W. Doane, contra:*

Jefferson Square was dedicated by the city of Omaha for the use of the public as a public square and park forever. (*Trustees of Methodist Episcopal Church v. Council of Hoboken*, 33 N. J. Law 17.)

Such dedication cannot be revoked or·the use to which the square was devoted changed. (*State v. Woodward*, 23 Vt. 92; *Story v. New York Elevated R. Co.*, 90 N. Y. 122; *New Orleans v. United States*, 10 Pet. [U. S.] 662; *San Francisco v. Canavan*, 42 Cal. 553; *Wilder v. City of St. Paul*, 12 Minn. 116; *Missouri Institute for Education of Blind v. How*, 27 Mo. 211; *Huber v. Gazley*, 18 O. 27; *City of Jacksonville v. Jacksonville R. Co.*, 67 Ill. 540; *Child v. Chappell*, 9 N. Y. 256; *Wyman v. Mayor*, 11 Wend. [N. Y.] 487; *Haynes v. Thomas*, 7 Ind. 38; *Price v. Thompson*, 48 Mo. 365; *City of Cincinnati v. White*, 6 Pet. [U. S.] 431; *Warren v. Mayor*, 22 Ia. 355; *In re Boston & A. R. Co.*, 53 N. Y. 574; *Inhabitants of Springfield v. Connecticut R. R. Co.*, 4 Cush. [Mass.] 63; *State v. Montclair R. Co.*, 6 Vroom [N. J. Law] 328; *Eastern R. Co. v. Boston & M. R. Co.*, 111 Mass. 125; *New York, H. & N. R. Co. v. Boston, H. & E. R. Co.*, 36 Conn. 196; *Cook v. City of Burlington*, 30 Ia. 98; *City of Ft. Wayne v. Lake Shore & M. S. R. Co.*, 132 Ind. 563; *Clark v. City of Providence*, 16 R. I. 337; *Franklin County v. Lathrop*, 9 Kan. 463.)

It is not in the power of the city authorities to appropriate a fund created by a vote of the electors for two specified objects, to one of those objects only. (*Gray v. Mount*, 45 Ia. 595; *McWhorter v. People*, 65 Ill. 290.)

Plaintiff may maintain the action. (*Whitfield v. Rogers*, 26 Miss. 87; *Gray v. Mount*, 45 Ia. 591; *Harney v. Indianapolis, C. & D. R. Co.*, 32 Ind. 244; *New London v. Brainard*, 22 Conn. 552; *Metzger v. Attica & A. R. Co.*, 79 N. Y. 171; *Mayor of Baltimore v. Gill*, 31 Md. 395; *Wyandotte & Kansas City Bridge Co. v. Commissioners of Wyandotte County*, 10 Kan. 326; *Hodgman v. Chicago & St. P. R. Co.*, 20 Minn. 41; *Webster v. Town of Harwinton*, 32 Conn. 131; *Merrill v. Plainfield*, 45 N. H. 134; *Barr v. Deniston*, 19 N. H. 180; *Wyman v. Mayor of New York*, 11 Wend. [N. Y.] 487; *Mayor of Macon v. Franklin*, 12 Ga. 239; *Mayor of Columbus v. Jaques*, 30 Ga. 507; *Rowan v. Town of Portland*, 8 B. Mon. [Ky.] 238; *Zearing v. Raber*, 74 Ill. 411; *Herbert v. Benson*, 2 La. Ann. 770; *Brockman v. City of Creston*, 79 Ia. 587; *Cummings v. City of St. Louis*, 90 Mo. 264.)

IRVINE, C.

There is in the city of Omaha a tract of land, occupying one city block, and known as "Jefferson Square." This has for many years been used as a public park, and a considerable sum of money has been expended in improving it and adapting it to such use. In 1893, by ordinance, the mayor and council submitted to the electors of the city a proposition for the issuing of bonds "to pay the cost of securing a site for a market place and erecting a market house thereon." The proposition was carried, and thereafter, by another ordinance, Jefferson Square was designated as the site for the erection of a market house, and a resolution was passed directing the board of public works, under the direction of the city engineer, to clear and grade the square, preparatory to the erection of the market house. These officers were proceeding to comply with the resolution when the plaintiff, showing no interest other than as a taxpayer of the city and a citizen thereof, brought this action to restrain the city and the officers named in the resolution from entering upon the square for the purpose indicated. On final hearing the injunction granted at the commencement

of the suit was made perpetual, and the defendants appealed.

An important question involved in the record, and one which has received a masterly discussion in the briefs, relates to the character of the city's title to the land, and whether it has been charged with a perpetual use as a park so that it is not within the authority of the city to divert it, under any circumstances, to a different use. While the district court seems to have passed on that question, it seems to us that it cannot be logically reached until certain other questions are disposed of; and the conclusion we have reached on these disposes of the case without a decision of the underlying question. No opinion is therefore expressed on the broad question referred to.

As the city charter stood at the time of the proceedings complained of the mayor and council had power "to erect and establish market houses, and market places, *   *   *   and   *   *   *   locate such market houses and market places   *   *   *   on any streets, alleys, or public grounds, or on any land purchased for such purpose." (Compiled Statutes 1893, ch. 12a, sec. 62.) It was evidently under this grant that the city undertook to act. The title of the ordinance submitting the proposition was as follows: "An ordinance providing for submitting to the legal electors of the city of Omaha at a general election to be held in said city on the 7th of November, 1893, the question of issuing bonds of the city of Omaha to the amount of two hundred thousand dollars to pay the cost of securing a site for a market place and erecting a market house thereon." The proposition voted on, as embodied in the ordinance, was as follows: "Shall bonds of the city of Omaha in the sum of two hundred thousand dollars be issued for the purpose of paying the cost of securing a site for a market place, not less than a block in size, and erecting a market house thereon, such market place to be on such block in said city north of Leavenworth street, south of Cuming street,

and east of Twentieth street, as may be designated by the mayor and council by ordinance after advertisement for bids of not less than four weeks, the said market house to be erected thereon to be in size at least two hundred and sixty-four feet by sixty feet, two stories in height, the lower story to be devoted to market house purposes, and the second story to contain a public assembly hall, the said bonds to run not more than twenty years and to bear interest, payable semi-annually, at a rate not to exceed five per cent per annum, with coupons attached, the said bonds to be called 'Market House Bonds,' and not to be sold for less than par, the proceeds of said bonds to be used for no other purpose than paying the cost of securing such site and erecting such market house, the said bonds to be issued from time to time as may be required during the years 1894 and 1895." The authority of the city government in the use and expenditure of the fund so provided was limited and strictly defined by the terms of the proposition so ratified by vote of the people. Beyond any doubt this proposition contemplated, not the issuing of bonds to the amount of $200,000 for the erecting of a market house on land already owned by the city and devoted to another purpose, but the purchasing of land for a market place, and the erection of a market house on the land so purchased. Contending against this construction counsel for the appellants call attention to the use, both in the title of the ordinance and in the proposition itself, of the word "securing" instead of "purchasing," and to the failure to designate any particular amount to be appropriated to the purchase of land. It is thence asserted that the voters could not have been influenced by the fact that any particular sum was to be so used, that a site might have been purchased for a nominal sum, and that the use of the word "secure" indicated an intention to permit the use of the fund to pay abutting damages and other expenses incident to the process of appropriating to this use and adapting thereto land already belonging to the city but theretofore de-

voted to other purposes. We cannot believe that the
electors so understood it. The statute contemplates two
things—market places and market houses, the distinc-
tion between the two being carefully preserved through-
out the section. By "market place" was evidently meant
something more than land occupied by a market house.
This distinction is preserved in the title and in the body
of the ordinance, the only connection therein being the
requirement that the market house shall be erected on
the market place. The proposition delimits an area
within the city within which the market place is to be
located, and we think we may perhaps take notice of the
fact·that the area designated is in the most thickly popu-
lated portion of the city. The proposition requires that
the designation of a site shall be made after advertisment
for· bids—clearly bids for the sale of land to the city.
This last feature unmistakably indicates the intention
to purchase land for the purpose. Every part of the or-
dinance reinforces that inference. When we recur to the
alternative power in the charter to locate market places
on streets, alleys, or public grounds, or else on land
purchased for the purpose, the intent of the proposition
adopted becomes a demonstrated fact. That when the
governing body of a municipality is authorized by a ·vote
of the people, and only thereby, to incur a debt for a par-
ticular purpose, such purpose must be strictly complied
with, and the terms ·of the authority granted be strictly
and fully pursued, is so well settled that it would be idle
to cite authorities on the proposition. That the mayor
and council, in attempting to erect a market house on
land already belonging to the city and used for another
purpose, were departing from the terms of the vote in a
material respect, and so diverting the funds at their dis-
posal to an unauthorized purpose, is evident on a mo-
ment's reflection. We may take notice of the fact that
American cities have largely grown up without adequate
provision for parks and public pleasure grounds, and
that many cities, including Omaha, after reaching an

advanced period of development, have found it necessary, at enormous expense, to purchase and improve land for parks. A large proportion of a city's inhabitants is therefore always jealous of any attempt to vacate parks already existing or to divert them in whole or in part to other purposes. That feeling may have been so strong that it would have led to the rejection of the market house proposition had it not by its language excluded the possibility of its bringing about the destruction of one of the parks. Again, $200,000 is a large sum to devote wholly to the construction of a market house. If land was to be purchased within the designated area it was certain to require a large portion of the sum voted wherewith to make the purchase. Men might be willing, from the necessity of the case, to vote bonds to the amount of $200,000 where a purchase of land was to be made, but not to incur so large a debt for the construction of a building on land already owned.

It is argued that the plaintiff, merely as a taxpayer, showing no special interest, cannot be heard to complain. Some early cases lend color to this argument, but they are all readily distinguishable. In *Normand v. Otoe County*, 8 Neb. 18, it was said that taxpayers might maintain an action to restrain county commissioners from an illegal exercise of their power, but that it must appear that they would be greatly or irreparably injured by the acts sought to be prevented. That was a proceeding to restrain the commissioners from carrying out a contract made with a lawyer to bring a suit for the county against the plaintiffs, it being alleged that the sum to be paid the lawyer was exorbitant. Clearly those particular taxpayers were properly denied relief. In *Parody v. School District*, 15 Neb. 514, it was said that the plaintiff must show some special damage not common to the public. The opinion shows that there was no assignment of error and no brief, and that the court was "left wholly in the dark" as to the questions presented. The purpose of the action was to restrain the removal of a schoolhouse. It

does not appear from the report that the plaintiff had children of school age, that he was a taxpayer, or that the proposed removal would entail any expense. He therefore showed no interest whatever. In *McLaughlin v. Sandusky*, 17 Neb. 110, it was said that it must appear that the plaintiff would suffer an injury. The plaintiff sued, not as a taxpayer, but as a land-owner, to prevent a road supervisor from opening a ditch from a highway upon his land. Relief was refused because there was no proof that his land would be injured. On the other hand, the right of a taxpayer to maintain a suit to restrain officers from wasting or unlawfully expending public funds, has been several times affirmed. (*Follmer v. Nuckolls County*, 6 Neb. 204; *Solomon v. Fleming*, 34 Neb. 40; *Ackerman v. Thummel*, 40 Neb. 95; *Morris v. Merrell*, 44 Neb. 423.) In a lucid discussion of the question in his work on Municipal Corporations, Judge Dillon says (sec. 914 *et seq.*) that the right of a taxpayer in such a case has been affirmed in many states and that it is now almost the universal doctrine. Of course he must bring himself within some equitable principle. In the case before us he has done this by seeking to prevent the violation of a trust, and the squandering of a trust fund for a purpose contrary to the trust. The right of a stockholder of a private corporation to so intervene is firmly established in cases where the governing body refuses to protect the rights of the stockholders or is itself the wrong-doer. As Judge Dillon suggests, there are still stronger reasons for permitting a taxpayer to assert the same right where the officers of a municipal corporation, charged with the protection of the property, are themselves violating the trust and diverting it from its proper use. Judge Dillon's views on the subject have been cited and adopted by the supreme court of the United States in *Crampton v. Zabriskie*, 101 U. S. 601, where Mr. Justice Field says: "Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county or the illegal creation of

a debt which they in common with other property-holders of the county may otherwise be compelled to pay, there is at this day no serious question."

AFFIRMED.