CHAMPION IRON COMPANY, APPELLANT, V. CITY OF SOUTH OMAHA, APPELLEE.

FILED JANUARY 31, 1913. No. 16,960.

1. Municipal Corporations: PUBLIC BUILDINGS: ACCESSORIES. The installation of cells in a "city hall," to be used in connection with a police court held in the building, is incidental to, and not inconsistent with, the general purpose for which such a building may be erected.

2. ———: ———: AUTHORIZATION. It is impossible to lay down an exact definition of the term "city hall." If separate buildings for different departments of city administration are erected upon the same site, so related to each other and to the main structure as to form practically a part of the same general plan, each of the buildings would be authorized by a vote• conferring power to issue bonds "to purchase a site and erect a city hall thereon."

3. ———: ———: ———. Under the facts recited in the opinion, *held* that the erection of cells in the police court building should be considered as forming a part of the general plan for a city hall, and that the cost thereof · is properly payable out of the money appropriated by the vote upon the issuance of bonds for the purchase of a site and erection of a city hall thereon.

APPEAL from the district court for Douglas county: HOWARD KENNEDY, JUDGE. *Reversed.*

*Lambert & Winters,* for appellant.

*John P. Breen* and *A. H. Murdock, contra.*

LETTON, J.

This is an action to recover a balance due upon a written contract for installing cell work in a building erected by the city of South Omaha. The city defends upon the ground that it was without power or authority to make and enter into the contract sued upon, for the reason that no appropriation had previously been made by the city either to construct the building or to install the cell work as a part thereof, and that there were no funds available

for that purpose in the city treasury. At the close of plaintiff's testimony the court directed a verdict in favor of the city, and from a judgment dismissing the action the plaintiff has appealed.

The evidence shows that a petition was presented to the city council, asking it to call an election for the purpose of submitting to the voters of the city the question of issuing bonds to the amount of $70,000 for the purpose of purchasing ground and erecting a city hall thereon for the use of the city. An ordinance was passed in conformity to the prayer of the petition, and a special election held under a call which submitted to the voters the question of issuing the bonds, the proceeds to be used "to purchase a site and erect a city hall thereon for the use of the city." The proposition for the issuance of the bonds carried at the election, and an ordinance was afterwards passed providing for the issuance of the bonds, and declaring that "the funds derived from the sale of said bonds shall be devoted exclusively to the purchase of a site and the erection thereon of a city hall for the use of the city." The evidence further shows that a site was purchased, a city hall erected, and another building erected upon a portion of the site purchased.

The section of the charter governing the issuance of bonds, so far as pertinent, is as follows (Ann. St. 1907, sec. 8410) : "The mayor and council may purchase the necessary grounds and erect thereon a city hall and other buildings that may be necessary for the use of the city. For the purpose of paying the cost thereof, the mayor and council are authorized to issue bonds in any sum not exceeding $100,000." This is followed by a provision regulating the issuance of bonds. Sections 8290, 8291, and 8292 provide, in substance, that the city council shall pass an ordinance to be termed "Annual Appropriation Bill," which shall specify the object and purpose for which appropriations are to be made; that an estimate shall be prepared before the appropriation is made each year; and that the mayor and council shall have no power to issue

or draw any order or warrants for the payment of money, unless the same shall have been appropriated or ordered by ordinance, or the claim has been allowed and the appropriation out of which such claim is payable has been made as provided in the annual appropriation bill. Section 8304, in substance, provides that no contract shall be made and no expense incurred, "unless an appropriation shall have been previously made concerning such expense, except as herein otherwise expressly provided."

The plaintiff contends that the provision of section 8410 giving power to erect a city hall and other buildings, and for issuing bonds for the purpose of paying for the same, is of itself an appropriation of the funds derived from the sale of the bonds to the purpose for which they are voted, and that the provision with reference to annual appropriation bills applies only to money derived from taxation and other sources. This seems to be conceded. Plaintiff also contends that, under the authorization to purchase a site and erect a city hall, the city and council were given power to make the contract sued upon. The stipulation of facts shows that after the sale of the bonds a site was purchased, 100 feet square, and an architect was employed to prepare plans and specifications for a city hall; that bids were called for for the construction of a city hall and jail building pursuant to the plans and specifications prepared by the architect; that bids were received and a contract let for the "construction and completion of the new city hall and jail for the sum of $43,770, containing a separate bid upon a coping or boundary wall connecting the two buildings, in the sum of $225;" that the contract for the two buildings included the installation of a heating plant (the same plant covering the heating of each building), and the contract included the electrical wiring and plumbing fixtures in each, and also the building of a coping wall between the buildings which extends from one building to the other. It is further stipulated that the plaintiff is claiming under an entirely separate and different contract from that of the builders; plaintiff's contract being "for

the installation of jail fixtures and cell work in the building devoted to the police court." At the time the contract was made there was sufficient money unexpended out of the $70,000 from the issuance of bonds to pay the full amount of the contract with the plaintiff, and there were no other funds available or appropriated for that purpose. The plaintiff called a witness and offered to prove that the cell work in the city jail building was constructed in accordance with the plans and specifications, except as to the alterations directed by the city officials and the architect, and that it was completed and taken possession of by the city before the action was begun. This testimony was objected to for the reason that there was no appropriation made other than the money received by the sale of the city hall bonds, and that there being no legal contract, and the action being upon the contract, the offer was irrelevant, incompetent and immaterial. The objection was sustained. The offer to show the amount or balance remaining unpaid upon the original contract was also denied upon the same ground. Further offers of proof were refused for the same reason, and the jury directed as stated.

From this statement it will be seen that but one question is presented, which is, whether a contract to furnish cell work for a building used in connection with the city hall for the police court of the city may be legally made under a vote authorizing the city officials "to purchase a site and erect a city hall thereon for the use of the city." The question is not free from difficulty. It is clear that the city authorities have no power or authority to use the money derived from the sale of bonds under this statute for purposes foreign to that for which the money was voted, but it is equally clear that a reasonable discretion must be vested in such officers as to the manner in which the building shall be constructed in order to serve the purpose of its erection. The photographs in evidence show two buildings near each other. The larger seems to be the city hall building, and the adjacent building bearing the tablet "Police Court" seems to be occupied by offices

or courtrooms in the second story, and by the jail on the ground floor. The buildings are connected at the street end by a wall without an opening therein. Each building has upon the side facing the other a door opening at the ground level, and a walk extending from the door in the one to the door in the other. Both from the stipulation of facts and from these photographs it appears that the building in which the cells are placed is also occupied by the police court of the city.

It is the contention of the city that because the statutes authorize it to erect hospitals, workhouses, houses of correction, jails, station houses, market houses, and marketing places, and to provide for the erection of other usual and necessary buildings, the city had no power to divert a part of the funds voted by the people for the construction of a city hall to the erection of any of the other buildings named in the statute. We think, however, that this is too narrow an interpretation to be placed upon the law. There is no restriction upon the power of the city to use a building for more than one purpose. The uses of a city hall building may be manifold. If such a building could in conformity with and incidental to the proper carrying out of the main purpose of its construction be used for more than one related purpose, we see no reason why this should not be done. It is a matter of public knowledge of which we take judicial notice that in some cities the administration of the police, fire and water departments is carried on in offices in the city hall, while in other cities the police department and fire department are cared for in buildings entirely separate and distinct, and which from their situation could not in any view be considered as forming a part of the city hall. If the council chamber, the mayor's office, the revenue department, the police department, and the police court had all been housed in one building, and if the authorities of the city had considered it to be necessary and proper for the dispatch of the police business of the city that cells should be set up in the basement of the same building, could it with reason be said that it was beyond

the powers of the city to contract for such cells? The accommodation of a police court is one of the ordinary purposes to which a city hall is devoted, and we think that an equipment of cells to be used in connection with and for the purpose of the police court could with propriety be housed under the same roof and be considered as a part of a city hall and equipment. If the buildings had been under one roof, therefore, we think there could be no question as to the power of the city to contract. Does the fact that both buildings are not under the same roof, although both are erected upon the site purchased for city hall purposes, and neither is used exclusively for a jail, change the result? It is not infrequent in the construction of hospitals or prisons that a central administration building is erected, with separate buildings for different purposes connected with the general plan. We think it has never been contended that such separate buildings used in connection with the main building and incidental to the general plan and purpose required a special authorization for their erection. If in the construction of a penitentiary the authorities should believe that a separate building should be used for a workshop or for a prison kitchen and dining room, could this render such separate building any less a part of the prison? Or, if it were deemed proper that the city should operate a separate lighting plant for the lighting of its city hall, could it not properly be erected upon the same site and in a separate building, as a part of the general purpose? In perhaps a majority of instances large public buildings are heated from separate buildings on the same site. But the heating plant is usually considered a part of the general plan, and therefore authorized. We are of opinion that it is not an essential requisite to the validity of a contract under bonds voted for the erection of a city hall that the same roof cover every department of the city administration. If the architect should with the approval of the city authorities distribute the city departments, executive, judicial, and administrative, into separate buildings on the site which has been devoted to

'city hall purposes as a part of the same general plan, and in connection with and in relation to each other, we think there is nothing in the statute to forbid. It is impossible to lay down an exact definition of the term "city hall." It is sufficient to say that where the buildings and appurtenances provided for are upon the same site, and are so related to each other and to the main purpose of the erection as to form practically a part of the same general plan, they may each and all be included within that category.

Defendant argues that, when the governing board of a municipality is authorized by the vote of the people to incur a debt for a particular purpose, such purpose must be strictly followed, and the terms of the authority granted must be strictly and fully performed, citing *Tukey v. City of Omaha*, 54 Neb. 370. There is nothing inconsistent with this in the view taken here. In that case it was sought to erect a market house in a public park after bonds had been authorized to purchase a site therefor and to erect the building on the site. The taking of the park was not contemplated by the voter as a consequence of his ballot in favor of the bonds.

We are convinced that the city authorities had the power to enter into the contract in question, and that the money required to be paid by its terms was sufficiently appropriated by the proceedings leading up to the issuance and sale of the bonds.

For the reasons stated, the district court erred in holding that the contract was void. Its judgment is therefore

REVERSED.