No. 14,851.

ARMSTRONG, STATE TREASURER *v.* FORD MOTOR COMPANY.

(123 P. [2d] 1018)

Decided March 9, 1942.

Mr. Byron G. Rogers, Attorney General, Mr. Henry E. Lutz, Deputy, Mr. James W. Creamer, Special Assistant, Mr. Gail L. Ireland, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Duke Dunbar, Assistant, for plaintiff in error.

Mr. W. W. Grant, Mr. Morrison Shafroth, for defendant in error.

*En Banc.*

Mr. Justice Knous delivered the opinion of the court.

The defendant in error, Ford Motor Company, a Delaware corporation, alleging that a controversy existed between it and plaintiff in error, hereinafter mentioned as the state, as to the application and effect of chapter 161, '35 C.S.A. (chapter 216, S.L. 1935), an initiated law commonly designated as the "Colorado Chain Store License Law," instituted a declaratory judgment action in the district court praying for an adjudication that the Ford Company was not liable for the payment of chain-store license taxes on Ford dealers, associate dealers and subdealers doing business in this state. The state filed an answer and cross complaint seeking a declaration that such dealer establishments were operated, directed and controlled by the Ford Company as chain stores within the meaning of the act and asked for judgment against the Ford Company in the principal sum of $199,363.50 for license taxes computed upon a multiple store basis allegedly accruing in the years 1935 to 1940 inclusive. After a trial in which much evidence was received, the district court found all issues of fact against the state and concluded as a matter of law and fact that the questioned dealer operations were not within the

act nor the company liable for the multiple store tax. To review the judgment so declaring, the state prosecutes this proceeding in error.

In so far as is here pertinent the act provides:

"Section 5. Every person, firm, corporation, association or co-partnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this state, under the same general management, supervision or ownership, shall pay the license fee hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments."

"Section 7. The provisions of this Act shall be construed to apply to every person, firm, corporation, association or co-partnership, either domestic or foreign, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management."

"Section 8. The term 'store' as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained or controlled by the same person, firm, corporation, co-partnership or association, either domestic or foreign, in which goods, wares or merchandise of any kind are sold, either at retail or wholesale."

The state concedes, as is undisputed, that the establishments in question are directly owned and operated by the individual dealers and not by the Ford Company, but contends primarily that by the terms of the contracts employed, the dealers are ultimately controlled and directed by the company within the meaning of section 7, supra, whereby the company is made amenable to the law. As supporting this contention the state cites the cases of *Gulf Refining Co. v. Fox*, 11 Fed. Supp. 425, affirmed, 297 U.S. 381, 56 Sup. Ct. 510, 80 L. Ed. 731; *Ashland Refining Co. v. Fox*, 11 Fed. Supp. 431,

affirmed, 297 U.S. 381, 56 Sup. Ct. 510, 80 L. Ed. 731; *Maxwell v. Shell Eastern Petroleum Products*, 90 F. (2d) 39, certiorari denied by the United States Supreme Court, October 11, 1937, 302 U.S. 715; *Standard Oil Company v. State Board of Equalization*, 110 Mont. 5, 99 P. (2d) 229; *Midwestern Petroleum Corp. v. State Board*, 206 Ind. 688, 187 N.E. 882; *Standard Oil Company of Texas v. State of Texas* (Tex.), 142 S.W. (2d) 519, wherein it was held that the contracts therein considered conferred upon the various companies involved, a sufficient modicum of control over agency or dealer operated filling stations handling the petroleum products of the respective companies at retail, as to make such companies liable, under statutes similar to ours, for a multiple chain-store tax on all such filling stations.

Upon this point the state also places reliance on the case of *Bedford v. Gamble-Skogmo, Inc.*, 104 Colo. 424, 91 P. (2d) 475, in which we held that the form of the contracts between Gamble-Skogmo, Inc., and the individual operators of "Gamble Store Agencies," in the light of the method of operation as disclosed by the evidence, made "irresistible the conclusion that the purpose of the contract was to initiate a system from which both parties could reap all the advantages of chain store operation with immunity from the burdens thereof, and further assuring to the company the special advantages of a chain without the necessity of its advancing or investing capital or assuming financial responsibility in the operation of the agency stores."

To demonstrate the pertinency and controlling effect of the foregoing authorities here, counsel for the state, by a painstaking comparison of the contracts herein and therein implicated, argue that the very contractual factors and elements which in the cited cases were held to import ultimate control to the companies within the meaning of the statute, c. f. §7, supra, are paralleled by certain provisions in Ford dealer contracts.

Secondarily, in the language of the attorney general

(italics ours), the state attributes liability to the Ford Company because "Ford dealerships are operated *as if* they were members of an integrated chain organization." Counsel further argue that such status arises from the effective coordinated contractual control of the dealers by the company, as claimed, and the benefits accruing through such relationship to the dealer outlets from Ford national advertising, the facilities of centrally located Ford warehouses and assembly plants, the general sales policy and the standard and efficient merchandising and accounting methods promulgated by the Ford Company.

██ In construing a statute the cause and necessity for it, the object in view, and the conditions to which it is directed, are always to be taken into account in determining its intent. *National Surety Co. v. Schafer,* 57 Colo. 56, 104 Pac. 199; *Richardson v. El Paso Con. Min. Co.;* 51 Colo. 440, 118 Pac. 982. It has been held that in considering the intent of a statute adopted as an initiated measure, it is proper to resort to arguments submitted to voters at the time it was adopted. *Crooks v. People's Finance etc. Co.,* 111 Cal. App. Supp. 769, 292 Pac. 1065. See, also, 59 C.J., p. 1020, §605.

██ In our opinion, when the social and economic manifestations which led to the adoption of chain-store legislation in this and many other states are examined, it is readily apparent, as the evidence in the case at bar proclaims, that it was not the intent of the legislative authority to extend such act to a business of the nature involved in the proceeding at bar. Obviously, as to businesses *without* the pale or scope of the law under consideration, questions relating to the element of control and the extent thereof over dealers in such fields, are deprived of the pertinency and effect which would be accorded if the operation was within the sphere of chain activities. The prelude to the enactment of legislation imposing graduated multiple license taxes on chain-store outlets was the widespread charges, rightly or wrongly

made, that the chains were ruining and driving out of business local retailers whose protection was of inherent benefit to the community; that in derogation of the business opportunities formerly open to young men, they were producing a nation of clerks; that they paid lower wages than other employers; did not pay their share of the local tax load; practiced unfair competition; tended to create a monopoly and compelled manufacturers to sell for less without any saving to the ultimate consumer. See, Zimmerman's Challenge to Chain Store Distribution. Thus, the genesis of chain-store tax statutes arose essentially in the economic and social conflict between the chains and independently owned stores competing in the same field. The factual differences between the methods of organization, management and ownership or control employed by the chain systems and the less advantageous business methods of independently owned stores competing in the same field, furnished the distinction which early was held to justify constitutionally a legislative classification for the imposition of graduated store taxes on chain outlets. *State Board of Tax Commissioners v. Jackson*, 283 U.S. 527, 51 Sup. Ct. 540, 75 L. Ed. 1248, 73 A.L.R. 1464.

The evidence in the case at bar unmistakably discloses, as the trial court found, that the adoption of the Colorado act flowed from the foregoing considerations and that its operation was directed objectively to the spheres of chain-store activity. The record before us shows that the Ford Company is in the business of manufacturing, at Dearborn, Michigan, automobiles, trucks and accessories and sells such products to dealers in the various states of the union, including Colorado, for resale under contracts between the company and dealer. The evidence indicated that in Colorado the respective incomes of the various dealers from the sale of Ford products ran from ten per cent to fifty per cent of their total business. Testimony was received evincing that in the United States all new automobiles of all

makes are sold under a dealer system, generally similar to that employed by the Ford Company. There is no evidence that any Ford dealer or any dealer in motor vehicles of any other make owns, operates or manages more than one such establishment. Thus, in Colorado every dealer of every manufacturer operates on the same plane with substantially the same limitations and advantages, as a consequence of which in this field there can be no competition between private stores and a chain system. Since none of the claimed antisocial or economic factors which led to the enactment of chain-store legislation, nor any of the advantages over the independent merchant which accrued to a chain by reason of its business methods are extant in the automobile sales industry, it would be unreasonable to assume that the Colorado act was intended to or does apply in the situation here under consideration. See, 12 Ry. Mt. Law Review, 51-56, for a discussion of this subject. It may be that these separately owned and operated dealer establishments are stores under the definition of the statute as the dealers seem to have recognized by applying for and receiving individual store licenses, but considering the intent of the act it cannot be maintained logically that in the aggregate such can be declared to be multiple units of any type of a chain organization.

The conclusion that the activity here disclosed is not a chain operation is supported by the fact, as appears from the evidence, that in the Census of Business of the Department of Commerce, vol. 4, Table 3, p. 55, said to be accepted by economists as an authoritative classification of businesses, a chain-store organization in the motor vehicle industry is not recognized as existing in Colorado.

For what evidentiary weight it may have, the record contains testimony to the effect that in none of the many states having chain-store acts similar to ours, has any attempt been made to tax separately owned automobile dealer establishments as chains.

Each and every of the cases cited by the state and hereinabove mentioned were addressed to situations where the activity in question was in competition with independent merchants and in a recognized or declared field of chain enterprise. Inherent to all was the portrayal of an elaborate effort to gain the competitive advantages of chain distribution against independent dealers in similar merchandise without payment of the license tax exacted by the pertinent act. Generally it was held that provisions similar to section 7 of the Colorado act were designed to forestall the usual attempted evasion of asserted diversity of ownership by making ultimate control as an effective criterion of liability as actual ownership. As appears, the proceeding at bar is not within the categories of these authorities and their pronouncements on the subject of control are so without pertinency here.

Although, as we have expressed, the question of the alleged control of the dealers by the company is not of decisive importance here, it would seem the finding of the trial court that such did not exist in fact, should be accorded the conclusive effect ordinarily attaining on review. Also, while in the view we take in the proceeding at bar, the decision in *Bukowich v. Ford Motor Co.*, 99 Colo. 56, 59 P. (2d) 470, is not of controlling effect, we believe it worthy of note to mention that therein we held that no provision of the dealer contract made the Ford Company "a corporation, 'operating, engaged in or conducting any business by * * * contracting out any part or all the work' thereof * * * within the meaning of section 49 of the [Workmen's Compensation] Act," section 328, chapter 97, '35 C.S.A., so as to make the company liable for the payment of compensation to the injured employee of a Ford dealer.

The judgment is affirmed.

Mr. Justice Jackson not participating.