No. 16,295.

McNichols, Auditor *v.* City and County of
Denver et al.
(209 P. [2d] 910)

Decided August 29, 1949.

Mr. WILLIAM H. SCOFIELD, for plaintiff in error.

Mr. J. GLENN DONALDSON, Mr. MALCOLM LINDSEY, Mr. ALFRED J. HAMBURG, for defendants in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

THE charter of the City and County of Denver requires that no loans shall be created or bonds issued unless the question of creating them shall be submitted to a vote of the electors qualified therefor.

By virtue of appropriate ordinance at an election duly held on May 20, 1947, the electors voted favorably upon the question, "Denver General Hospital: Shall the city council of the City and County of Denver * * * issue * * * bonds of the City and County of Denver in the principal sum of $500,000, or so much thereof as may

be necessary, to be used for the purpose of improving, extending, and equipping the Denver General Hospital. * * *?" The bonds issued pursuant thereto were sold and the proceeds deposited with the treasurer in an account denominated "1948 Hospital Bond Account." Thereafter an agreement with an architect for plans, specifications and supervision in connection with the construction of "a municipal hospital building" was executed in behalf of the city and registered by the city auditor. However, in fact, as admitted by defendants in error, the building as thereafter designed and now under construction was planned and intended, not for hospital purposes, but solely for use of and occupancy by the Denver Bureau of Public Welfare. The city auditor upon learning of the nature and purpose of the building withheld further funds for its construction on the ground that the submission clause under which the bond issue was approved did not permit the proceeds of the bonds to be used for such purpose, and the city by its proper officers brought this action to determine whether the funds arising from sale of said bonds may be so used. The essential allegations of the complaint were admitted by answer, with the additional undisputed allegation that the plans of the building erected are essentially plans for an office building, rather than a building for the treatment of sick or injured persons, or any activity in connection with such treatment at the Denver General Hospital. The trial court held that the erecting of the building to house the Denver Bureau of Public Welfare was a proper use of the funds derived from sale of the bonds, and such decision is here for review.

There is no conflict in the evidence submitted. The charter of the City and County of Denver provides for a Department and Manager of Health and Charity. Thereunder is a Bureau of Health and Hospitals and a Bureau of Public Welfare, each under a separate director. The functions of the Bureau of Health and Hospitals are the supervision and operation of hospital and

other institutional services provided for medical and surgical treatment of indigents of the community, and the provision and supervision of preventive medical services. These services embrace every field belonging to a general hospital, including a five-hundred bed hospital, a training school for nurses and administrative offices, and are carried on in a group of some fifteen buildings occupying two and a half blocks generally known as the Denver General Hospital.

The functions of the Bureau of Public Welfare are administration of the old age pension program, aid to dependent children, general assistance, child welfare services, day care of children of working mothers, aid to the blind and tuberculosis patients. None of these functions includes any medical or surgical treatments; the last two named include referral of indigent cases needing treatment, but there is no evidence that such referrals need be or are to the Denver General Hospital. The bureau administers federal, state, and local funds in the amount of approximately $8,000,000 a year, and its housing needs include offices for interviewing those seeking relief, space for some eighty clerical and stenographic employees and supervisory personnel, for filing cases, and for administrative and case working staff, in addition to an auditorium, cafeteria, library and heating plant.

At the time of the bond election with which we are here cncerned, all buildings included in the Denver General Hospital group were used for customary hospital purposes and other services performed by the Bureau of Health and Hospitals and necessary administrative and incidental services in connection therewith, except that one of the smaller buildings and a portion of one floor of another building, together having a floor space of 22,000 square feet, were used as administrative offices of the Bureau of Public Welfare. The inadequacy of these offices and the need for adequate housing for this essential and humanitarian work is not disputed. The

384

building proposed, and in fact now under construction from the proceeds of the sale of the bonds authorized by the electors, is located on a half block owned by the city across the street from the buildings and grounds of the Denver General Hospital.

■ The question of creating a bond issue necessarily includes not only the amount and terms of the bonds, but also the purpose for which they are to be used. This has repeatedly been declared by the courts and text writers. "To obtain the authority of the electors to incur an indebtedness, or to enter into a contract otherwise prohibited, the matter must be submitted to them in such specific language as to apprise the voters of the full purpose and the exact and particular thing upon which they are called upon to vote and decide." *O'Neil Engineering Co. v. Town of Ryan,* 32 Okla. 738, 124 Pac. 19. "A question submitted to the people for their vote must not be misleading, but must be specific, and in all essential particulars in compliance with the requirements of the statute or charter." 5 McQuillan Municipal Corporations (2d. ed.), p. 1411, §2357. "It has also been laid down as a general rule that the question submitted to the people for their vote must not be misleading, and that the statement on the ballot should be sufficient to inform voters with certainty as to the proposition submitted." 43 Am. Jur. p. 342. "It has been laid down as a general rule that the question submitted to the people for their vote, and the notice thereof must not be misleading." *Anselmi v. City of Rock Springs,* 53 Wyo. 223, 80 P. (2d) 419. "That when the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly complied with, and the terms of the authority granted by strictly and fully pursued, is so well settled that it would be idle to cite authorities on the proposition." *Tukey v. City of Omaha,* 54 Neb. 370, 74 N.W. 613. "It is elementary law that when funds are raised by the issuing of bonds or by

taxation for a designated purpose they cannot be diverted to some other purpose." *Thompson v. Pierce County,* 113 Wash. 237, 193 Pac. 706. "It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted. It is also elementary that in instances where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully. In other words, a court has no right to substitute its judgment and discretion for the judgment and discretion of the governing body upon whom the law visits the primary power and duty to act. Of course, if such governing body acts illegally, unreasonably, or arbitrarily, a court of competent jurisdiction may so adjudge, but there the power of the court ends." *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W. (2d) 975.

The requirements, as declared by the courts, may be summarized as follows: (1) The question submitted to the voters must be specific and apprise them of the particular purpose for which the bonds are proposed to be issued; (2) the purpose so submitted must not be misleading; (3) the proceeds of the bonds must be spent for the purpose for which they were voted; and (4) if in fact and in good faith the money is spent for the purpose for which it was voted, the judgment and discretion as to its expenditure must be that of the officials charged therewith and not that of the court.

In the situation before us, the question presented to the electors was apparently specific, and did apprise the voters of a particular purpose for which the bonds were to be issued. They were asked to authorize bonds "for the purpose of improving, extending and equipping Denver General Hospital." The words "improving," "extending," and "equipping" are specific, and necessarily refer to something already in existence. Denver General Hospital was an existing institution.

A challenge that the purpose of the bond issue was

misleading would ordinarily go to the validity of the bonds, while a challenge that the proceeds were to be spent for a purpose other than that for which they were voted would go to the validity of the expenditure. Where, as in the case before us, the question was apparently specific and apprised the voters of a particular and proper purpose, and the bonds, as here, have been issued and purchased in good faith, the bonds are valid in the hands of the purchaser and the challenge can go only to the purpose of the expenditure.

The word "hospital" in its ordinary usage means an institution for the medical or surgical care of the sick, the injured or the infirm. Such, in substance, is the definition of the word in the dictionaries and in the adjudicated cases. *Hull Hospital v. Wheeler,* 216 Ia. 1394, 250 N.W. 637; *Johnson, City Tax Collector v. Mississippi Baptist Hospital,* 140 Miss. 485, 106 So. 1; *Noble v. Bank,* 241 Ala. 85, 1 So. (2d) 289; *Pagel v. Trinity Hospital Ass'n,* 72 N. D. 262, N.W. (2d) 392; *Frax Realty Co. v. Kleinert,* 205 N. Y. Supp. 728; Webster's New International Dictionary. Words presumably are used and understood according to their ordinary usage. The burden is on one asserting otherwise so to show.

It is urged in behalf of the city, and was found by the trial court, that the term "Denver General Hospital" as used in the submission clause of the bond issue is a generic term, and therefore included the purpose of a building for welfare. If we follow this resort to technical terminology, we can only conclude that health and welfare, under our municipal system of organization, are different genera, and Denver General Hospital is but a species of the genus health. Use of the name of a species of one genus could hardly be so generic as to include another genus altogether. Other than in its technical meaning, the word "generic" is defined as, "General (opposed to specific or special)," Oxford English Dictionary, and "opposed to specific," Webster's New International Dictionary. To say that the use of the term was generic,

then, is but another way of saying it was not specific, and therefore in violation of the first requirement for validity of a bond issue.

Had the attempted use of the proceeds been for housing of the nursing school or for a new nurses' home, it might have been urged, whether or not successfully, that such use was incidental to the city's hospital operations and essentially connected with, and a part of, the functions of the Denver General Hospital, but here the use proposed is not even connected with the hospital functions as an incidental use. It is an entirely distinct use—a use for welfare, not for health; for financial, not for medical or surgical assistance; a use operated by an entirely separate bureau of the city, separately budgeted, separately managed and separately financed.

There is nothing in the evidence even to suggest that the word "hospital" as included in the term "Denver General Hospital" had other than its usual meaning to the voters who approved the bond issue, or that the term "Denver General Hospital" was used or generally understood "generically" so as to refer to or include welfare administration. In the testimony of the director of the Bureau of Health and Hospitals, he referred to "patients admitted to the Denver General Hospital" who were known to be "clients of the Bureau of Public Welfare," and testified that he considered the primary function of the Denver General Hospital was to render medical care to the poor and destitute. A study of general assistance and hospitalization costs, made by the Denver Bureau of Public Welfare and received in evidence, refers to the flow of information between the Denver General Hospital and the Denver Bureau of Public Welfare and also to the cooperation of the Denver General Hospital with the Bureau of Public Welfare in making the study. The record contains correspondence of the advisory board of the Bureau of Public Welfare with reference to procuring inclusion of a bond issue for the benefit of that bureau among the projects for which

bond issues were to be sought at the election. This correspondence repeatedly refers to housing the Bureau of Public Welfare, to the public welfare matter, to the item for public welfare, to a building for the Bureau of Public Welfare, to the housing needs of the Denver Bureau, to plans for a welfare building, and to adequate facilities for housing the Denver Bureau of Public Welfare, without a single mention of identity or association with the Denver General Hospital. In the publicity given the project as contained in the record, reference was made to the needs of the Denver Bureau of Public Welfare and the statement made, "It was first housed in a wing of Denver General Hospital. Later it expanded into the old nurses' home at 650 Cherokee Street." The correspondence refers to a new building for the Department of Health and Charity for the use of the Denver Bureau of Public Welfare, and to the employees who are being housed in the old nurses' building and in one floor and the basement of a wing of the Denver General Hospital. It is said that the "construction of this administration building will in fact benefit the Denver General Hospital, because it will release 22,000 square feet of space in the hospital buildings which is now occupied by the Denver Bureau of Public Welfare." The public understanding that the term "Denver General Hospital" did not mean welfare administration is strikingly shown by the minutes of a meeting of the advisory board of the Bureau of Public Welfare, as follows: "Mr. Davis remarked that because our project is on the bond issue as improvements to Denver General Hospital and no mention is made of the Denver Bureau of Public Welfare, it is hard to get our story across." From all this evidence it plainly appears that even to those most intimately acquainted and concerned, the term "Denver General Hospital" was used with reference to the institution for medical and surgical care as distinguished from the Bureau of Public Welfare and its services.

It is urged that welfare activities and hospital activ-

ities have long been associated together, and that welfare activities as well as hospital activities have been carried on in the same or adjoining buildings for many years. However, association does not result in identity either of function or of name. The departments of fire and police under the Denver charter operate together under the Manager of Safety and Excise, and might have a combined building which would contain both police headquarters and fire station, but it could hardly be contended from that fact that the proceeds of a bond issue voted for the building of fire station could be used for the construction of a building for police administration.

■ It is urged that the public was fully informed as to the intent to use the proceeds of the bond issue for housing the Bureau of Public Welfare. We have held that in considering the intent of a statute adopted as an initiated measure, it is proper to resort to arguments submitted to voters at the time it was adopted. *Armstrong v. Ford Motor Co.,* 109 Colo. 188, 123 P. (2d) 1018. However, the intent of a statute, an ordinance or a contract is to be determined primarily from the wording of the instrument itself and resort is had to extraneous evidence only where there is uncertainty and ambiguity in the instrument to be construed. It is said in behalf of the city that there is such ambiguity here. Unfortunately for the position so taken it destroys, rather than strengthens, the city's case, for the reason that it is the first essential of the validity of a bond issue that the question submitted be specific and not misleading. To say that it is ambiguous is to admit that it is not definite and specific and may be misleading. Where a contract or a statute is ambiguous, the court must determine which meaning was intended. Where a question submitted to the electors on a bond proposal is ambiguous, the bonds must fail.

■ We held in *Denver v. Hayes,* 28 Colo. 110, 63 Pac. 311, consistent with the decisions in other jurisdictions, that bonds are invalid where issued for several purposes

unless each purpose and the amount proposed therefor is separately submitted so that it can be separately approved or rejected by the electors. Extending the city's hospital facilities, and housing the city's welfare administration staff, are two entirely separate and different purposes. Under the rule announced in *City of Denver v. Hayes, supra,* bonds would be invalid if authorized for those two purposes unless each purpose and the amount therefor was separately submitted so that it could be separately approved or rejected. It could not wisely be said that by using an ambiguous term in stating the purpose of a bond issue that requirement might be avoided and the city authorized to spend all the bond proceeds for either purpose without the taxpayers having been permitted to vote on either separately. Accordingly the term "Denver General Hospital" could apply to an administration building for the Bureau of Public Welfare only in case the Bureau of Public Welfare were a recognized and integral part of the Denver General Hospital to such an extent that the words "Denver General Hospital" meant to the voters the administrative offices of the Bureau of Public Welfare. It is not sufficient to say that the words carried the connotation both of treatment of the sick and aid to those in need. If so, the voters should have been informed specifically which of the two purposes the bonds were to serve.

In *Schultz v. Police Jury, Tangipahoa Parish,* 196 La. 359, 199 So. 215, the proposition to be voted on was couched in the most general terms. In support of its validity it was shown by testimony that the purpose was commonly understood in the community and that every intelligent person residing there knew of the contemplated purpose. The court said: "What the voters knew or may have thought they knew privately as to the kind or character of the plant contemplated by the resolution of the Police Jury calling the election is not controlling. The only thing they could lawfully know is what was contained in the proposition actually submitted for their

approval or disapproval. While the electors may have thought that in voting to approve the proposition they were voting for the erection of a plant for the processing of milk, there is nothing in the proposition, as approved, which binds the Parish Agricultural Industrial Board, the creation of which is provided for by the statute, to establish such a plant, or which prohibits the board from erecting a plant for the conversion or processing of any other form of agricultural products, if it should see fit to do so."

 Finally it is urged that the city has a reasonable discretion in use of the proceeds of the bonds. This is true, but a use for a purpose other than that authorized by the voters is not within the range of reasonable discretion. Counsel cite *Champion Iron Co. v. City of South Omaha,* 93 Neb. 56, 139 N.W. 848; *Gillham v. City of Dallas* (Tex.), 207 S.W. (2d) 978; *Meyering v. Miller,* 330 Mo. 885, 51 S.W. (2d) 65, and *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W. (2d) 975, as illustrating liberal construction, and broad discretion vested in the city. In substance the first case holds that where the administration of the police department is carried on in a city hall, the provision of jail cells therein is included within the purpose of bonds issued for erecting the city hall, but that where the police department is cared for in separate and distinct buildings, it would not be included in such purpose. The second case holds that erecting and equipping a building to be rented and used for cold storage rooms, offices and other facilities incidental to a market distributing center might properly be included in the purpose of a public market and the erection of necessary buildings, appurtenances and equipment therefor. The third case holds that bonds issued for the purpose of acquiring lands and constructing additions to and extensions and equipment of public hospitals would include the erection of a new hospital on a location separate from any then existing. The last case holds that the purpose of constructing, building, equip-

ping and improving pleasure grounds, parks and play grounds is sufficiently broad to include construction of an auditorium and buildings for the exhibition of livestock to be used for shows and rodeos, sometimes free to the public and sometimes requiring payment of admission. None of these cases involves a situation similar to that before us; none of them holds that the proceeds of bonds issued for one specified purpose may be used for another purpose not incidental to that approved by the voters. On that question we note *O'Farrell v. Sonoma County*, 189 Cal. 343, 208 Pac. 117, holding that where bonds had been approved for the construction of a specified road for a specified amount, the county board had no authority to obtain bids for and expend a large part of the money so authorized for constructing part of the road only. The purpose of the bonds was strictly construed as being for the construction of the entire road. So in *Thompson v. Pierce County*, 113 Wash. 237, 193 Pac. 706, it is held that where bonds were authorized in specified amount for improvement of a named highway between two named points, the county officers could be enjoined from spending any of the money to construct a new road over part of the route. In *Board of Education v. Powers*, 142 Kan. 664, 51 P. (2d) 421, the board of education proposed to erect and furnish a school building and to obtain a portion of the amount required from P. W. A. funds so that a bond issue was necessary only for financing a portion of the intended expenditure. A proposition submitted to the voters for issuance of the bonds contained no reference to federal monies, but contained a statement only of the amount of the contemplated bond issue, and that it was for the purpose of erecting a school building. It was held that the proposition was so obscurely stated that the electors might have been misled thereby and mandamus to compel the state auditor to register the bonds was denied. To similar effect the court ruled in *Kansas Electric Power Co. v. City of Eureka*, 142 Kan. 117, 45 P. (2d)

880. In *Schultz v. Police Jury, Tangipahoa Parish, supra,* bonds were authorized by law "for the erection and maintenance of industrial plants 'for the conversion or processing of raw farm or agricultural products.' " Bonds were authorized by vote of the qualified electors "for the purpose of erecting and maintaining an industrial plant for the conversion or processing of raw farm or agricultural products." Such bonds were held void, in that the purpose was not specifically stated and there was nothing to advise the voters as to the nature, kind, or extent of the plant to be erected. In *Coleman v. Frame,* 26 Okla. 193, 109 Pac. 928, the voters approved of bonds for the purpose of "improvement of the fire department," and bonds issued pursuant thereto were held invalid, the court saying that, "A proposition attempting to refer to the qualified property tax paying voters of a city whether said city shall be allowed to become indebted for the purchase, construction, or repair of public utilities * * * must be stated in such specific language as to apprise the voters of the nature of the public utility the city wishes to purchase, construct or repair." None of these cases serves as exact precedent, but each of them illustrates the insistence of the courts that the purpose of a bond issue be specifically stated and that the bonds be used only for the purpose so declared.

We must keep in mind that public officials are servants of the people; that constitutional provisions and charters are created to mark the limits of their authority in the conduct of public business; that it is the duty of public officials to observe such restraints, and the duty of the courts to enforce them. There is no valid reason why the purpose for which bonds are to be used should not be specifically stated on the ballots. When the purpose is not so stated, the voters are denied their right of choice. When it is so stated, the use of the proceeds for any other purpose is a violation of the city charter and a wrongful diversion of the funds, because such use has

not been authorized by the people. Regardless of our own desires and regardless of the seriousness of the situation, we must hold that authority to issue bonds for improving the Denver General Hospital is not authority to issue bonds for construction of an administration building to house the Bureau of Public Welfare. To hold otherwise would be to violate the provisions of the city charter and set a dangerous precedent for vague, ambiguous, colored and confusing statements in submitting future bond issues, and the deceit of the people thereby.

The judgment of the trial court is reversed and the case remanded with instructions to enter judgment consistent with the views expressed herein.

Mr. Justice Moore not participating.